DOROTHY RUSH et al., Plaintiffs-Appellants, v. MOSTAFA HAMDY et al., Defendants-Appellees (Ravi Kottoor, d/b/a Central Gastroenterology Clinic, Ltd., et al., Defendants).

Fourth District   No. 4—93—0182

Argued August 24, 1993.—Opinion filed December 28, 1993.—
Rehearing denied February 10, 1994.

354

James Wylder (argued), of James Walker, Ltd., of Bloomington, for appellants.

Karen L. Kendall (argued), David R. Sinn, and James M. Voelker, all of Heyl, Royster, Voelker & Allen, of Peoria, for appellees.

JUSTICE KNECHT delivered the opinion of the court:

Dorothy and Lester Rush brought suit against Dr. Mostafa Hamdy and Central Gastroenterology Clinic, Ltd., Hamdy's employer, for injuries sustained when Hamdy perforated Dorothy's esophagus while performing an esophageal dilatation. A McLean County jury returned a verdict in favor of defendants. Plaintiffs appeal. They contend they did not receive a fair trial as the result of two comments made by defendants' counsel in closing argument. Plaintiffs additionally allege the trial court erred in ruling on two evidentiary matters and in allowing a witness to be taken out of order. We reverse.

## I. FACTS

In 1986 Dorothy was diagnosed with Schatzki's ring, a narrowing of the esophagus near where the esophagus joins the stomach which causes difficulty in swallowing foods. Schatzki's ring is treated by esophageal dilatation, which involves a stretching of the esophagus. There are several types and sizes of dilators used to treat esophageal disorders. One type of dilator is a bougienage, or "bougie," dilator, which is made from rubber or thermoplastic and does not change size or inflate. Another type of dilator is the balloon dilator, which is inflated by either water (hydrostatic) or air (pneumatic) during use. One type of pneumatic balloon dilator used to treat esophageal disorders is the achalasia dilator. Achalasia is a type of esophageal disorder unrelated to Schatzki's ring.

There is a risk, when performing an esophageal dilation, the esophagus will become perforated. A perforated esophagus can allow bacteria generally present in the esophagus to leave the esophagus and infect surrounding tissues and organs. Symptoms evidencing an esophageal perforation are chest pain, nausea, and an elevated white count. If not treated properly, an esophageal perforation may result in death. In the event of an esophageal perforation, the first 24 hours are the most critical. Within the first 24 hours, a surgeon can surgically mend the tear in the esophagus. However, after 24 hours have passed, such operations are generally unsuccessful, as the tissues become inflamed and more delicate, and are unable to hold the sutures.

In 1986, Dorothy was treated by Dr. Nalin Patel. Dr. Patel determined the size of Dorothy's Schatzki's ring by having Dorothy swallow a radiopaque substance which caused her Schatzki's ring to be visible on an X ray. The opening of Dorothy's Schatzki's ring was measured at 1.5 centimeters. On January 27, 1986, Dr. Patel dilated Dorothy's Schatzki's ring with a 1.8-centimeter dilator. The procedure was initially successful; however, the Schatzki's ring ultimately returned.

On February 27, 1987, Dorothy consulted Hamdy about her disorder. She told Hamdy she had been diagnosed with Schatzki's ring and had been treated by dilatation. Hamdy did not order any tests to be performed and scheduled Dorothy for a balloon dilatation on March 9, 1987. According to Hamdy's records, the only prior medical record of Dorothy's which he had obtained was a record of a barium swallow which had been performed two years earlier. His records contain no indication he obtained any information about Dorothy's prior dilatation or the tests performed by Patel. However, Hamdy testified he

knew either he or his secretary called either Patel or Patel's secretary and asked to be read notes of what Patel had done. Although Hamdy could not remember (and there was no indication in his records) what size dilator Patel had used, Hamdy testified he knew, on March 9, 1987, the size dilator Patel had used.

On March 9, 1987, Hamdy examined Dorothy at Brokaw Hospital, where she was scheduled to have the balloon dilatation. Hamdy used an endoscope to view Dorothy's esophagus. Hamdy initially recorded the opening of Dorothy's Schatzki's ring as 1.5 centimeters. The hospital had all types of dilators available. Hamdy chose the largest, a four-centimeter achalasia dilator. This dilator was more than twice the size of the dilator Patel had used. Hamdy placed the dilator in Dorothy's esophagus and began to inflate it. He determined it was in the wrong place, deflated the dilator, moved it, and began to reinflate it. Hamdy initially recorded he used five millimeters of mercury which was maintained for five seconds. After five seconds, Dorothy complained of pain and the procedure was terminated. Dorothy had nausea, dry heaves, and chest pain. Hamdy prescribed medicine for the nausea and painkillers. Due to the complications, Dorothy was admitted to the hospital at 11:40 a.m.

After Dorothy was admitted, Hamdy altered the medical records, changing the measurement of the opening of the Schatzki's ring from 1.5 centimeters to 2.5 centimeters and changing the pressure maintained from 500 millimeters mercury to 5 pounds per square inch. Hamdy explained these changes were corrections.

At trial, Hamdy conceded if a "gastrogafin" swallow had been performed on March 9, it would have revealed Dorothy had a perforated esophagus; however, none was performed. Hamdy testified he recommended a "gastrogafin" swallow be performed, but Dorothy refused. Although Hamdy made notes of his visits with Dorothy on March 9, no notation of the recommendation or refusal appears in the notes. On the morning of March 10, a "gastrografin" swallow was performed, revealing a three-centimeter tear in Dorothy's esophagus. Hamdy began to treat Dorothy with antibiotics. Sometime later that day, he contacted Dr. Lawrence Raines, a surgeon. On March 11, Raines performed surgery. The tissues were inflamed and the tear in the esophagus could not be mended. Raines laid the tissues on top of each other and put in drains, in hope the perforation would ultimately heal naturally. Dorothy remained hospitalized until March 31, 1987. Dorothy continued to see Hamdy at his office until the end of May 1987, when Hamdy moved to California.

After moving to California, Hamdy contacted Dorothy by telephone on at least two occasions. At trial, Hamdy testified about one telephone call he made to Dorothy. Plaintiffs sought to introduce testimony of the substance of one of the telephone conversations, in which Hamdy requested the Rushes delay filing any lawsuit against him because he was applying to practice medicine in California and would be required to disclose any pending lawsuits on his application. The trial court, which had previously allowed a motion *in limine* precluding such testimony, refused to allow the testimony; however, an offer of proof was made for the record.

At trial, several physicians testified regarding the applicable standard of care. Hamdy testified prior radiological tests are not necessary before performing a dilation, because the Schatzki's ring can be viewed and measured more accurately by the use of an endoscope. According to Hamdy, the use of an achalasia dilator to treat Schatzki's ring is appropriate and up to a 10-centimeter dilator may be used. Hamdy testified it is the radiologist's responsibility to determine the placement of the dilator. Finally, Hamdy testified on March 9, he was not certain whether Dorothy's esophagus had been perforated, and treatment of a perforated esophagus with antibiotics is appropriate. Hamdy testified Dorothy's dilation was the first dilation he performed in Illinois. In his training in Ohio, Hamdy had performed 50 to 100 dilations; however, only 5 to 10 of these dilations were for Schatzki's rings.

Dr. Stephen Holt, a specialist in internal medicine and gastroenterology, testified on behalf of plaintiffs. Holt is the chairman of the gastroenterology department at the Seton Hall Graduate School of Medicine and director of St. Mary's and St. Michael's Medical Centers in New Jersey. Holt has previously served as the chief of the gastroenterology department and director of the gastroenterology diagnostic lab at Southern Illinois University School of Medicine. Holt has in excess of 100 publications.

Holt testified it is the gastroenterologist's responsibility to determine the placement of the dilator. Holt additionally testified it is inappropriate to measure the Schatzki's ring with an endoscope, because the insertion of the endoscope stretches the esophagus and provides an inaccurate view of the ring under normal conditions. Radiology is the proper method to view and diagnose a Schatzki's ring. Holt testified achalasia dilators are used to treat achalasia, and only under very rare circumstances are to be used to treat Schatzki's ring. Holt testified a 4-centimeter dilator should not have been used when a 1.8-centimeter dilator had previously been used with success. Finally, Holt

testified the delay before contacting a surgeon was inappropriate. Holt concluded Hamdy's conduct violated the standard of care.

The evidence deposition of Dr. Stephen Matter, a practicing gastroenterologist, was read into evidence. Matter testified an achalasia balloon is used for the treatment of achalasia and it is improper to use it to treat either a 1.5- or 2.5-centimeter ring. Matter testified he had seen more than 200 Schatzki's rings during the course of his practice.

Dr. Michael Shekleton, a practicing gastroenterologist, testified on behalf of defendants. Shekleton testified the use of an achalasia dilator to treat Schatzki's ring would be appropriate. Shekleton has performed 500 to 1,000 dilatations. Shekleton testified the only case in which he had ever heard of an achalasia dilator being used to treat a Schatzki's ring was Hamdy's dilatation of Dorothy.

Dr. Thomas Thomas also testified on behalf of defendants. Thomas had not practiced gastroenterology since 1981, had never dilated a Schatzki's ring, and had not used a balloon dilator in 25 years. Thomas testified Hamdy's conduct did not violate the applicable standard of care.

The jury found in favor of defendants. This appeal followed.

## II. Improper Comments In Closing Argument

Plaintiffs contend defendants' counsel made two improper statements in closing argument. Plaintiffs objected to both statements; one objection was overruled and the other was sustained. We find both statements were improper and violated an order *in limine* and constituted reversible error.

### A. *Dr. Hamdy's Professional Reputation*

In closing argument, defendants' counsel improperly made reference to the impact of the outcome of the case upon Hamdy's professional reputation. Specifically, counsel stated: "Dr. Hamdy has his professional reputation on the line here. If he has seemed uptight or excited at times, please consider that he has a lot at stake here. His professional reputation is very important to him." There was no evidence introduced of the impact of a verdict against Hamdy on his professional reputation; accordingly, it was improperly referenced in closing argument. Closing argument is limited to comment upon the evidence and inferences which may reasonably be drawn therefrom. Counsel's remark also violated the court's *in limine* order. The impact of a verdict against a defendant upon the defendant's reputation is irrelevant and should not be considered by the jury in resolving the is-

sue of defendant's negligence. A reference to the impact of a verdict upon defendant's reputation is an appeal to the passions and sympathy of the jury.

■ Defense counsel's remarks that Hamdy's professional reputation was "on the line" or "at stake" were improper as they were not supported by the evidence. Commentary in closing argument is limited to facts in evidence. (*Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 19, 558 N.E.2d 493, 506; *Augenstein v. Pulley* (1989), 191 Ill. App. 3d 664, 670, 547 N.E.2d 1345, 1349.) Since there was no evidence introduced regarding the impact of an adverse verdict upon Hamdy's professional reputation, counsel's remarks were improper.

Counsel's remarks additionally violated the court's *in limine* order. Prior to trial the court granted paragraph 3 of plaintiffs' motion *in limine*, precluding defense counsel from, *inter alia*, implying "[d]efendant's ability to practice medicine or his standing in the community would be financially damaged if the jury returned a verdict against him." In paragraph 11 of their motion *in limine*, plaintiffs additionally requested defense counsel be precluded from suggesting "that a jury verdict against Dr. Hamdy will 'label him a mal-practitioner', bad doctor, etc." The court granted this paragraph in part and denied it in part, stating the defense would not be precluded from arguing "there's nothing that my client has done that could possibly be considered malpractice, that he's not a bad doctor."

Since defense counsel did not merely argue Hamdy's conduct did not constitute malpractice, but contended Hamdy's reputation was "on the line" and "at stake," defense counsel violated the *in limine* order. Violation of an *in limine* order has been found not to rise to the level of reversible error where the *in limine* order was overly broad and restrictive, thus impairing the defense of a case. (*Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 936, 479 N.E.2d 1091, 1098.) However, in the present case the defense has neither alleged any defect in the *in limine* order nor addressed the plaintiffs' contentions that defense counsel violated the *in limine* order. We determine the violation of the *in limine* order constituted reversible error.

Even in the absence of the *in limine* order, counsel's comments were inappropriate. A reference to the impact of an adverse verdict upon defendant's professional reputation is improper as it interjects an improper element into the case and is little more than an appeal to the passions and sympathy of the jury. In *Torrez v. Raag* (1976), 43 Ill. App. 3d 779, 357 N.E.2d 632, the appellate court addressed the propriety of directing the jury's attention to the effect of an adverse

verdict upon the physician's reputation and ability to practice medicine, an issue of first impression in Illinois. Although noting there was no uniformity of opinion among other jurisdictions, the court cited cases from four jurisdictions in which direction or invitation to consider the impact of the adverse verdict upon a medical professional's reputation was found improper. The appellate court concluded a reference to the physician's professional reputation interjected an improper element into the case. Although plaintiff objected to the remark and the objection was sustained, the trial court, in ruling on a motion for a new trial, found the remark had a prejudicial effect upon the jury and ordered a new trial. (*Torrez*, 43 Ill. App. 3d at 783, 357 N.E.2d at 635.) The appellate court affirmed, finding the trial court did not abuse its discretion in finding the remark prejudiced the jury, particularly in view of the close nature of the evidence. *Torrez*, 43 Ill. App. 3d at 783-84, 357 N.E.2d at 635.

Defendants argue *Torrez* was discussed and rejected by the third district in *Mast v. Krusemark* (1980), 83 Ill. App. 3d 107, 403 N.E.2d 743. This is inaccurate as the third district did not *reject Torrez*, but *distinguished* it on the facts. (*Mast*, 83 Ill. App. 3d at 113, 403 N.E.2d at 747.) In *Mast*, the court found a remark that the defendant's reputation was at stake was improper; however, the court found the error was harmless, although plaintiffs' objection was overruled. *Mast*, 83 Ill. App. 3d at 112-13, 403 N.E.2d at 747.

It is clear, under both *Torrez* and *Mast* the defense's reference to Hamdy's professional reputation as being "on the line here," and that Hamdy "has a lot at stake here. His professional reputation is very important to him" were improper.

### B. *Impact of Money Verdict on Defendant*

In closing argument defendants' counsel stated Hamdy was not "here to be hit with a money verdict." Plaintiffs objected and the objection was sustained. On appeal, plaintiffs contend this remark was prejudicial as it misled the jury by implying Hamdy would be personally responsible for satisfaction of any judgment entered. It is uncontroverted both defendants were insured and any verdict rendered in this case would have been satisfied by insurance.

Defendants contend any error was cured when the trial court sustained plaintiffs' objection. In support of their position, defendants cite *Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 573 N.E.2d 1315, and *McCray v. Shams* (1992), 224 Ill. App. 3d 999, 587 N.E.2d 66. In *Skelton*, defense counsel improperly referred to the jurors by name. The appellate court found this error was cured when

the trial court sustained plaintiff's objection. (*Skelton,* 214 Ill. App. 3d at 583, 573 N.E.2d at 1335.) In *McCray,* the appellate court determined a misstatement of evidence by defense counsel was cured when the court sustained plaintiff's objection. (*McCray,* 224 Ill. App. 3d at 1006, 587 N.E.2d at 71.) Plaintiffs contend *Skelton* and *McCray* are distinguishable as neither dealt with the interjection of an improper element into the case. Plaintiffs contend the misrepresentation of whether Hamdy had insurance was an improper element. Unlike improper reference to jurors and misstatement of evidence, plaintiffs contend, the interjection of an improper element into the case mandates reversal.

■ The parties have cited and no cases have been found in which an Illinois court has discussed the issue of a statement which is alleged to have caused the jury to believe defendant was uninsured when, in fact, defendant was insured. However, even when true, statements regarding a litigant's insurance or financial ability to satisfy a judgment are improper. Thus, the analysis employed in cases in which truthful representations of insurance (or lack of it) or financial ability were made may be helpful.

It is improper to inform the jury, either directly or indirectly, that the defendant is insured against liability on a judgment that might be entered against him. (*Kavanaugh v. Parret* (1942), 379 Ill. 273, 277, 40 N.E.2d 500, 502.) Similarly, an uninsured defendant may not inform the jury of his lack of insurance and financially vulnerable position. (*Imparato v. Rooney* (1981), 95 Ill. App. 3d 11, 17, 419 N.E.2d 620, 624; *Rowley v. Rousseau* (1980), 81 Ill. App. 3d 193, 196, 400 N.E.2d 1045, 1048.) Evidence of insurance or lack of it is excluded because it is irrelevant to the issue of negligence, yet might influence a jury in determining in which party's favor to render a verdict, and the size of the verdict. (See generally *Imparato,* 95 Ill. App. 3d at 15, 419 N.E.2d at 623.) However, the mere mention of insurance or the lack thereof does not mandate reversal. (See *Mudd v. Goldblatt Brothers, Inc.* (1983), 118 Ill. App. 3d 431, 442, 454 N.E.2d 754, 762.) In *Mudd,* plaintiff claimed a defense attorney prejudiced him by implying one defendant had no insurance to pay a claim. The remark complained of was as follows: " 'That complaint is served on Terry [Frankovich], he comes to court, he hires an attorney, he defends the case.' " (*Mudd,* 118 Ill. App. 3d at 442, 454 N.E.2d at 762.) The appellate court found no specific mention of whether the defendant had insurance, and if the lack of insurance was somehow implied by counsel's statement, the comment did not require reversal. *Mudd,* 118 Ill. App. 3d at 442-43, 454 N.E.2d at 762.

Likewise, when only compensatory damages are recoverable, the financial condition of the parties is irrelevant and often prejudicial. Such evidence appeals to the sympathy of the jury for presumably the jury will favor those least able to bear the loss. If undue emphasis is placed on the irrelevant evidence, or if the jury's verdict is affected by it, then reversal is warranted. (*Pagel v. Yates* (1984), 128 Ill. App. 3d 897, 902, 471 N.E.2d 946, 951.) To warrant reversal the language utilized in a reference to defendant's financial condition must be reasonably understood to refer to the financial status of one of the parties and must result in prejudice to the complaining party. *Schultz v. Siddens* (1989), 191 Ill. App. 3d 622, 628, 548 N.E.2d 87, 90.

We find the reference here to being "hit with a money verdict" was more specific than the statement in *Mudd* and could have misled the jury into believing Hamdy would bear the burden of any money judgment returned. The references to Hamdy's professional reputation and being "hit with a money judgment" appealed to the sympathy of the jury and, therefore, constituted reversible error.

### III. LIMITATION ON CROSS-EXAMINATION OF DEFENDANTS' WITNESS

Plaintiffs allege the trial court erred in preventing plaintiffs from asking defendants' expert witness whether he would have treated Dorothy with a "Savary" dilator rather than an achalasia balloon. Dr. Michael Shekleton testified the dilation of a Schatzki's ring with an achalasia balloon was within the acceptable standard of care. In his deposition, Shekleton acknowledged if Dorothy had been his patient, he would have treated her with a Savary dilator. Plaintiffs contend there is a difference in the persuasive value of an expert witness who testifies a certain procedure is within the standard of care and is the procedure which the expert himself would have used under the same circumstances and an expert who testifies a certain procedure is within the standard of care, but that he would not have utilized that procedure under the same circumstances. We agree. However, we find the trial court did not abuse its discretion in precluding this line of inquiry in light of the testimony that was permitted to be elicited from Shekleton.

The latitude to be allowed on cross-examination is a matter within the sound discretion of the trial court; a reviewing court will not reverse absent an abuse of discretion resulting in manifest prejudice to the complaining party. Generally, any kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witnesses. (*People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267, 281.) Plaintiffs

elicited testimony from Shekleton that he had *never* used an achalasia balloon to dilate a Schatzki's ring, and in all of his years of practice Hamdy's treatment of Dorothy was the only case he knew of in which an achalasia balloon had been used to dilate a Schatzki's ring. This testimony sufficiently tested the credibility of Shekleton's opinion that the use of an achalasia dilator was within the acceptable standard of care to the jury.

### IV. ORDER OF WITNESSES

Plaintiffs allege the trial court erred in allowing defendants' expert witness, Dr. Michael Shekleton, to testify after Hamdy had testified for the defense, but before plaintiffs had the opportunity to cross-examine him. Plaintiffs allege they were prejudiced because Hamdy had the "benefit" of hearing Shekleton's opinions before undergoing cross-examination. In support of their position, plaintiffs cite *Carlson v. New York Life Insurance Co.* (1966), 76 Ill. App. 2d 187, 222 N.E.2d 363.

The order in which evidence is presented is within the discretion of the trial court. An abuse of discretion is likely to occur only when a party is prevented from impeaching witnesses, supporting the credibility of impeached witnesses, or responding to new points raised by the opponent. (*Barth v. Massa* (1990), 201 Ill. App. 3d 19, 33, 558 N.E.2d 528, 537.) In *Carlson*, the appellate court found the decision to take a witness out of order was an abuse of discretion where doing so limited a party's ability to cross-examine that witness. (*Carlson*, 76 Ill. App. 2d at 202, 222 N.E.2d at 371.) However, where a party's ability to cross-examine a witness is not restricted by taking a witness out of order, *Carlson* is inapplicable. See *Atz v. Goss* (1974), 21 Ill. App. 3d 878, 882, 316 N.E.2d 29, 32.

We find *Carlson* is inapplicable to the present case as taking Shekleton's testimony out of order did not restrict plaintiffs' ability to cross-examine either Shekleton or Hamdy. We additionally find any change in Hamdy's testimony after hearing Shekleton testify gave rise to an issue of credibility to be resolved by the jury, but did not make the trial court's decision to allow Shekleton's testimony to be taken out of order an abuse of discretion.

In *Carlson*, plaintiff's testimony was interrupted to permit plaintiff's expert to testify. The expert gave his opinion with respect to the causation of plaintiff's maladies based on hypothetical facts which it was presumed would be testified to by plaintiff. Since defendant had not had the opportunity to cross-examine plaintiff regarding these facts, the defendant was restricted in its ability to cross-examine the

expert with respect to the expert's opinion based on alternate facts which might have been brought out on the cross-examination of plaintiff, of alternate causes of plaintiff's condition. Under these circumstances, the appellate court determined defendant had been deprived of its full right of cross-examination of the expert and the trial court therefore erred in allowing testimony to be taken out of order. *Carlson*, 76 Ill. App. 2d at 202, 222 N.E.2d at 371.

The present case is distinguishable from *Carlson* as plaintiffs do not claim they were restricted in their ability to cross-examine either Shekleton or Hamdy. Rather, plaintiffs claim Hamdy "benefitted" by hearing Shekleton's testimony prior to undergoing cross-examination.

Plaintiffs argue that prior to Shekleton's testimony, Hamdy took the position the use of an achalasia balloon to dilate a Schatzki's ring which had been previously dilated and not cured is automatic, and that he had been trained to use an achalasia balloon to dilate a Schatzki's ring under these circumstances. Shekleton was asked whether a gastroenterologist would make the automatic decision to use an achalasia balloon to treat a patient who had Schatzki's ring dilated once but not cured. Shekleton responded no decision in medicine should be automatic and an automatic decision is an incorrect decision. On cross-examination, plaintiffs asked Hamdy whether he had been taught to use an achalasia balloon to treat a Schatzki's ring which had previously been dilated but not cured. Hamdy responded "You are never taught anything automatic," and then stated he did not decide to use an achalasia balloon to treat Dorothy until he examined her on the day of the procedure.

█ We decline to extend *Carlson* to cases such as this, in which taking a witness out of order may have affected the way a party testified on cross-examination. If Hamdy's initial position may be interpreted as one that the use of an achalasia dilator is "automatically" used to treat a patient with a Schatzki's ring which has been previously dilated but not cured, it is inconsistent with the position taken after Shekleton's testimony. However, any inconsistency merely gave rise to an issue of credibility to be resolved by the jury. We additionally note the "benefit" Hamdy received by hearing Shekleton's testimony is not unique to the interruption of a witness' testimony. The defense could have elected to call Shekleton prior to calling Hamdy and Hamdy would have received the same "benefit" of hearing Shekleton's testimony prior to giving his own.

## V. Hamdy's Request That Plaintiffs Delay Filing Suit

Plaintiffs allege the trial court improperly excluded evidence that

several months after treating Dorothy, and after moving to California, Hamdy contacted the Rushes and requested they delay filing a lawsuit against him. Hamdy explained he was filing an application to practice medicine in California and did not wish a lawsuit to be pending against him as he would be required to disclose this on his application. Prior to trial defendants filed a motion *in limine* requesting plaintiffs be prohibited from eliciting testimony regarding Hamdy's request to delay the filing of a lawsuit. Defendants alleged this request was not relevant to whether Hamdy violated the standard of care and was more prejudicial than probative. The trial court granted this motion. Plaintiffs allege the trial court erred in granting the motion *in limine* because the testimony should have been admitted as it is relevant to the issue of Hamdy's credibility. Plaintiffs additionally allege the exclusion of this testimony caused the testimony that Hamdy continued to telephone Dorothy, even after moving to California (introduced by the defense), to be cast in the light of a physician concerned about the welfare of his patient, rather than a physician concerned about the possibility of a malpractice suit. We agree.

The decision whether to grant a motion *in limine* rests within the discretion of the trial court. In ruling on a motion *in limine*, the court should balance the prejudice that might be avoided if it grants the motion against the complication or inconvenience that would result if the motion is denied. (*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.* (1991), 224 Ill. App. 3d 559, 578, 586 N.E.2d 600, 613.) However, a motion *in limine* precluding the offering of evidence at trial should be employed with caution as it may unduly restrict the opposing party's presentation of its case. (*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 549-50, 416 N.E.2d 268, 271.) It is improper for a court to allow a motion *in limine* which limits or precludes the introduction of relevant evidence. *Mack v. First Security Bank* (1987), 158 Ill. App. 3d 497, 504, 511 N.E.2d 714, 718-19.

■ Hamdy's request that the filing of a lawsuit be delayed so he would not have to report the existence of a lawsuit to the California licensing authorities was relevant to the issue of Hamdy's credibility. As noted above, generally any kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witnesses. (*Collins*, 106 Ill. 2d at 269, 478 N.E.2d at 281.) Impeachment of a witness on cross-examination is designed to aid in ascertaining the degree of credit due a witness. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§607.1, 705.2 (5th ed. 1990).) Hamdy's request might have

been viewed by the jury as indicative of dishonesty or a desire to conceal facts from that medical licensing board that ought be reported.

Hamdy's statement was not substantially more prejudicial than probative. Relevant evidence should be excluded only if its probative value is substantially outweighed by its prejudice. (*People v. Chambers* (1989), 179 Ill. App. 3d 565, 578, 534 N.E.2d 554, 561.) Only evidence which is unfairly prejudicial, that is, having an undue tendency to suggest decision on an improper basis such as bias, sympathy, hatred, contempt, or horror will be excluded. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1 (5th ed. 1990).) We find the prejudicial effect of Hamdy's request does not *substantially* outweigh the probative value of the request on the issue of Hamdy's credibility. Thus, we find the trial court abused its discretion in granting the motion *in limine.*

Moreover, even were we to find the trial court's ruling on the motion *in limine* was proper, the defense opened the door to the admission of testimony regarding Hamdy's request. Defendants introduced testimony of Hamdy's telephone calls to the Rushes, which could not be viewed in proper context in light of the exclusion of testimony of the telephone call in which Hamdy made his request to delay the filing of the lawsuit. A party opens the door to the admission of evidence which would otherwise have been excluded under a motion *in limine.* (See *Hamrock v. Henry* (1991), 222 Ill. App. 3d 487, 494-95, 584 N.E.2d 204, 210.) In *Hamrock,* plaintiff obtained a motion *in limine* precluding defendant from introducing evidence that she was receiving collateral source payments, namely, a pension. (*Hamrock,* 222 Ill. App. 3d at 494, 584 N.E.2d at 210.) In her direct examination plaintiff testified she had been referred to a physician by the pension board. On cross-examination, defendant inquired into whether plaintiff was examined by doctors to determine whether she was eligible for a pension and whether she received a pension as a result. Plaintiff alleged these questions on cross-examination violated the *in limine* order. The appellate court found plaintiff opened the door to these questions by her reference to the pension board, and the answers were, therefore, properly admitted. *Hamrock,* 222 Ill. App. 3d at 494-95, 584 N.E.2d at 210.

Hamdy called the Rushes at least twice after he moved to California. In one conversation, he requested the Rushes to delay filing a lawsuit against him. In a later conversation, he inquired about Dorothy's health. Hamdy, on direct examination by the defense, gave testimony regarding the later conversation. In the absence of evidence of the first conversation, Hamdy's testimony of the later con-

versation portrays him as a doctor concerned about his former patient's health. However, viewed in context of the first conversation, the jury could have concluded Hamdy was actually a doctor more concerned about the possibility of a malpractice action. By introducing evidence of the later conversation, Hamdy opened the door to the admission of evidence of the substance of the earlier conversation as well.

## VI. CONCLUSION

This judgment of the circuit court is reversed and this cause is remanded for a new trial.

Reversed and remanded.

COOK and GREEN, JJ., concur.