JONATHAN T. LENZ, Plaintiff, v. JOSEPH P. JULIAN, JR., Defendant (Richard A. Korjenek, Jr., Plaintiff-Appellee and Cross-Appellant; Joseph P. Julian, Jr., Defendant-Appellant and Cross-Appellee).

Second District    No. 2—94—1362

Opinion filed November 6, 1995.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for appellant.

Robert J. Hauser, of Sullivan, Smith, Hauser & Noonan, Ltd., of Waukegan, and Keith L. Hunt, of Leader & Hunt, P.C., of Northbrook, for appellee.

JUSTICE THOMAS delivered the opinion of the court:

The plaintiff, Richard A. Korjenek, Jr., filed this negligence action in the circuit court of Lake County against the defendant, State Trooper Joseph P. Julian, Jr., to recover for personal injuries the plaintiff sustained as a result of an automobile collision at an intersection. This action was consolidated with a negligence action brought by Jonathan T. Lenz against Trooper Julian arising out of the same accident. Lenz was the driver and Korjenek the passenger in a vehicle which was struck by Julian's police car. A jury awarded plaintiff Korjenek $189,071 in damages but found that Julian was not liable as to Lenz. Following a post-trial hearing, the trial court

found that the jury had ignored the unrebutted evidence of Korjenek's medical bills, and, therefore, it increased the award and entered judgment in favor of Korjenek for $219,809.66. The court then allowed a $100,000 setoff for a payment previously paid to Korjenek by Lenz's insurance company. Julian appeals, contending that Korjenek's suit was barred by the doctrines of sovereign immunity, public officials' immunity, and *res judicata*. Korjenek cross-appeals, claiming that he is entitled to a new trial on damages because the trial court excluded Jews from the jury and defense counsel made improper comments during closing argument.

The record reveals that State Troopers Julian, Bruce Shimizu, and Joseph Perez were assigned to patrol Lake County on the night in question. Shimizu was assigned to patrol the western half of the county, and Julian was assigned to patrol the eastern half of the county. At one point during his shift, Shimizu saw a motorcyclist pass other vehicles in a no-passing zone. Shimizu activated his emergency lights and attempted to stop the vehicle. When it became clear that the driver was attempting to evade the trooper, Shimizu advised the dispatcher by radio that he was pursuing the motorcycle. In turn, the dispatcher made a broadcast requesting that any units in the area offer assistance. Shimizu pursued the vehicle across the Wisconsin State line. Eventually the trooper lost sight of the motorcycle and radioed that he was calling off the chase at 12:45:31 a.m. At that time, he did not know which direction the fleeing motorist was proceeding.

Trooper Julian heard the initial broadcast about the fleeing motorcyclist when he was outside of his vehicle at a gas station about 8 to 10 miles from Shimizu. Even though Shimizu and the motorcyclist were heading away from Julian at the time, Julian decided to offer assistance because he considered it to be an emergency situation. Julian's vehicle was not equipped with mars lights, but it did have revolving red and blue flashing lights in the front and rear, which he activated. Julian took Route 21 to Route 41 and then proceeded north on Route 41. Julian was travelling between 80 and 90 miles per hour within one mile of the accident scene. At approximately 12:47:11 a.m., nearly two minutes after Shimizu radioed that he was cancelling the chase, Julian's vehicle entered the intersection of Routes 41 and 173 and collided with a vehicle driven by Lenz in which Korjenek was a passenger. Korjenek was thrown from the vehicle and suffered severe and permanent injuries. Witnesses testified that Julian's flashing lights were not visible to most motorists and that he only activated his siren shortly before entering the intersection. Several witnesses gave varying estimates of Julian's

speed as he entered the intersection, *i.e.*, between 80 and 90 miles per hour, between 65 and 80 miles per hour, between 55 and 60 miles per hour, and 35 miles per hour. Six witnesses testified that Lenz's car had the green light at the time of the collision. Julian testified that he had not heard at the time of the accident that Shimizu's chase had been discontinued. According to Julian, the last broadcast he heard concerning the chase indicated that Shimizu and the motorcyclist had crossed the border into Wisconsin. Julian further testified that he intended to travel near the Wisconsin border to intercept the vehicle in the event it returned to Illinois travelling south on Old Route 41 or a nearby frontage road.

Trooper Perez testified that Julian told him after the accident that he intended to travel to Wisconsin to assist Shimizu. This would have been a violation of Illinois State Police policy, which only permits State Police vehicles that are in hot pursuit to cross the State line.

State Police Sergeant Scott Norwood testified that Trooper Julian told him that at the time of the accident he knew the chase had already been called off by Shimizu. According to State Police policy, a trooper should weigh the seriousness of the offense against the potential for death or injury to others when deciding to engage in a high-speed pursuit of a motorist. However, it is the pursuing officer and not an assisting officer who is to balance the factors and decide whether to continue the pursuit.

On appeal, Julian first argues that the doctrine of sovereign immunity bars Korjenek's claim in the circuit court. Under this doctrine, the circuit court would be without subject-matter jurisdiction to entertain a lawsuit which is in reality a claim against the State because it involves an employee of the State engaged in his official duties. Julian contends that the accident occurred while he was on duty and attempting to apprehend a fleeing motorcyclist and, therefore, he was engaged in activity unique to his employment as a State trooper.

■ The determination of whether an action is in fact a suit against the State turns upon an analysis of the issues involved and the relief sought, rather than the formal designation of the parties. (*Currie v. Lao* (1992), 148 Ill. 2d 151, 158.) An action brought nominally against a State employee in his individual capacity will be found to be a claim against the State where a judgment for the plaintiff could operate to control the actions of the State or subject it to liability. (*Currie*, 148 Ill. 2d at 158.) However, where a State employee is charged with breaching a duty imposed on him *independently* of his State employment, sovereign immunity will not attach and a negligence claim

may be maintained against him in the circuit court. (*Currie*, 148 Ill. 2d at 159.) A State employee who breaches a duty he owes regardless of his State employment is no more entitled to immunity than is a private individual who breaches that same duty; the mere fact of his State employment should not endow him with heightened protection. (*Currie*, 148 Ill. 2d at 160.) In keeping with these principles, the rule has evolved that claims based on the negligent operation of an automobile by a State employee are generally outside the doctrine of sovereign immunity. (*Currie*, 148 Ill. 2d at 160.) This rule, of course, is not without exception: in some circumstances, a State employee's manner of operating a vehicle may be so unique to his employment that a lawsuit aimed at his negligent driving could operate to control the actions and policies of the State. See, *e.g.*, *Campbell v. White* (1991), 207 Ill. App. 3d 541; *Postich v. Henrichs* (1994), 267 Ill. App. 3d 236.

In *Currie*, the Illinois Supreme Court found that sovereign immunity did not apply to bar a claim against a State trooper for his negligent operation of a motor vehicle while on duty. There, the trooper's area of responsibility included Will County, and his assignment on the date in question was to regulate traffic on Interstate 80. The trooper testified that he received a call from the dispatcher directing him to report to a disturbance within the Joliet city limits. En route, the trooper drove the wrong way on a one-way street and collided with another vehicle. Prior to the accident, the trooper had been driving close to the speed limit. The court questioned the trooper's veracity about whether he was responding to a disturbance because Joliet police department records did not reflect a request for assistance from the State Police. The court further noted that, even if the trooper was responding to a call for assistance, it was clear that responding to such a call was not part of the trooper's normal and official functions as a State trooper. The court also questioned the trooper's claim that he was responding to an emergency situation noting that any "emergency" which had existed would certainly have become a nonemergency given the manner in which the trooper travelled to the scene. The court concluded that the duty the trooper was charged with breaching did not arise as a result of his employment as a State trooper but, rather, arose as a result of his status as the driver of an automobile on a public roadway.

In reaching its decision, the *Currie* court distinguished *Campbell v. White* (1991), 207 Ill. App. 3d 541. In *Campbell*, a State trooper began a high-speed chase of a suspect after the suspect's motorcycle passed the trooper while he was adjusting his radar. Eventually, the suspect's motorcycle came to rest in the median; the suspect stepped

onto the highway and was struck by the trooper's vehicle, causing the death of the suspect. In holding that the plaintiff's claim was barred by the doctrine of sovereign immunity, the *Campbell* court found that the trooper operated his vehicle in a manner uniquely related to his State employment where he was driving in hot pursuit of a violator of the law. *Currie* distinguished *Campbell* on the basis that in *Campbell* the trooper was operating his vehicle in a manner in which only a governmental official is authorized to act, while in *Currie* the trooper drove his vehicle in a routine manner on a public street.

Here, Trooper Julian contends that the present case is similar to *Campbell* and *Campbell* should control the outcome. He also relies on *Postich v. Henrichs* (1994), 267 Ill. App. 3d 236, for the proposition that even if his determination that an emergency existed was unreasonable under the circumstances, the plaintiff's claim was nonetheless barred under the doctrine of sovereign immunity.

Because we find that an analysis of *Postich* will be helpful in addressing the claim that *Campbell* is controlling, we will discuss *Postich* first. In *Postich*, a Department of Conservation police officer received a call for assistance which involved a report of a man armed with a gun in a forest preserve. The officer testified that he considered the situation to be an emergency because on occasion deer had been killed there and ammunition that had a range of 1.7 miles had been found on the ground. He believed a life-threatening situation existed because of the nearby location of an expressway and a residential area. In *dicta*, the *Postich* court stated that, even if the officer's evaluation of the situation as an emergency was objectively unreasonable, it should be treated no differently than if an emergency actually existed. However, the court then proceeded to examine the facts of the case and concluded that the officer's emergency response was not unreasonable under the circumstances. We find Julian's reliance on the *dicta* in *Postich* to be erroneous and at odds with the supreme court's analysis in *Currie*, where the court examined the circumstances of the case and found that the trooper's claim of an emergency was negated by his actions. Accordingly, we find that a relevant inquiry in our analysis involves a determination of whether it was reasonable for the trooper to engage in an emergency response under the circumstances of the case, considering what the trooper knew up to the time of the accident.

Here, Julian's fellow troopers testified that Julian told them he intended to travel to Wisconsin to apprehend the suspect and that he knew that Trooper Shimizu had already abandoned his pursuit of the suspect prior to Julian's accident. This fact is corroborated by the

computer printouts showing the various communications with the dispatcher. Additionally, Trooper Shimizu did not know which direction the suspect was headed when he lost him in Wisconsin. Thus, the record contains evidence showing that any emergency which may have existed was no longer an emergency at the time Julian negligently drove his vehicle through the intersection where the collision occurred. In *Currie,* it was the trooper's actions of driving slowly and routinely to the scene which negated his claim of an emergency. Similarly, the facts surrounding Julian's actions negate the existence of an emergency where the trooper knew the chase had been abandoned, did not know the location of the suspect, and intended to act in an unauthorized manner outside of his scope of authority. It is clear that in both *Currie* and the present case no emergency existed at the time of the collision.

Unlike *Postich,* the present case did not involve a report of a man with a firearm. Furthermore, the officer in *Postich* intended to travel to a scene within his sphere of authority. Here, Julian intended to leave his jurisdiction to continue the high-speed pursuit of a suspect when that pursuit had already been abandoned by the only trooper charged under State Police policy with the responsibility of deciding to continue the chase across the State line.

■ Julian's conduct in engaging in a high-speed chase of a motorist where he was not in hot pursuit and knew the pursuing officer had called off the chase makes this case easily distinguishable from *Campbell.* Under the particular facts of this case, we find that Julian breached a duty owed to the plaintiff independently of his State employment and that he was not performing a uniquely governmental function at the time of the collision. In fact, he was embarking on a chase in a manner in which he was not authorized to act. Therefore, the doctrine of sovereign immunity did not deprive the circuit court of subject-matter jurisdiction to hear the plaintiff's claim.

Julian next argues that he was immune from suit under the doctrine of public officials' immunity because his conduct involved the performance of a discretionary duty. We disagree that Julian's conduct involved the performance of a discretionary duty.

■ The common-law doctrine of public officials' immunity dictates that public officials are immune from personal liability for their performance of discretionary duties. (*Currie,* 148 Ill. 2d at 166.) The doctrine is premised upon the principle that a public decisionmaker should not be subject to personal liability where he makes a decision based upon his perception of the public needs. (*Campbell,* 207 Ill. App. 3d at 553.) The immunity attaches only to conduct by a public official that is discretionary, rather than ministerial, in nature. (*Cur-*

*rie*, 148 Ill. 2d at 166.) Moreover, it is well settled that public officials' immunity does not apply to every discretionary act by an official but rather only to those acts which are unique to the particular public office. *Currie*, 148 Ill. 2d at 166-67.

■ In *Currie*, the court found that the trooper's decisions about when and where to turn were not of an official discretionary nature. Therefore, the court concluded, the trooper was not entitled to be shielded from liability under the doctrine of public officials' immunity. Similarly, Julian's decisions about what speed to travel and whether he should stop or sufficiently slow his vehicle at an intersection to avoid a collision were activities of a nonofficial nature. Julian claims that it was his decision to offer assistance to another trooper that gave rise to the immunity. Julian's claim must be rejected. Just as in *Currie*, the decision that caused the accident in the present case was not the decision to respond to a call for assistance. Julian was free to offer assistance, but it was not his offer of assistance that caused the accident but rather the speed at which he chose to travel through the intersection. As previously discussed, Julian was not in hot pursuit of the suspect and the chase had been abandoned. Accordingly, we find that Julian was not exercising his official discretion at the time of the collision, and he is therefore not entitled to immunity from suit under the doctrine of public officials' immunity.

■ Lastly, Julian argues that the plaintiff's claim was barred by the doctrine of *res judicata*. In that regard, Julian points out that plaintiff Korjenek filed a prior negligence complaint against Julian in the circuit court of Lake County arising out of the same accident. The complaint was initially dismissed with prejudice on March 14, 1991, on the basis that it was barred by the statute of limitations. Since the plaintiff did not appeal from that judgment, Julian contends that it became a final order subjecting the instant suit to dismissal under the principles of *res judicata*.

One of the criteria necessary for the application of the doctrine of *res judicata* is that there be a final judgment on the merits rendered by a court of competent jurisdiction. (*Downing v. Chicago Transit Authority* (1994), 162 Ill. 2d 70, 73.) We find that requirement to be lacking in the present case. When the plaintiff filed his prior complaint in Lake County, he specifically stated in the complaint that he was merely seeking to transfer the case pending in the Court of Claims to the circuit court of Lake County. The trial court, however, ignored this plea and proceeded to enter an order on March 14, 1991, which appeared to dismiss that case with prejudice based on the fact that the case was filed beyond the two-year statute of limitations. The court also noted in that order that the case could not be

transferred from the Court of Claims because that court had proper subject-matter jurisdiction. On March 25, 1991, the court considered the plaintiff's motion to transfer as a motion to reconsider the court's March 14, 1991, order. In its March 25 order ruling on the motion to reconsider, the court did not mention the statute of limitations but instead found that the case could not be transferred from the Court of Claims where jurisdiction was proper in that court. The plaintiff did not appeal from the March 25 order. Instead, he had the Court of Claims case voluntarily dismissed on September 15, 1992. He then filed the present cause of action in the circuit court of Lake County on September 1, 1993, which was within the one-year limit provided by section 13—217 of the Code of Civil Procedure (735 ILCS 5/13—217 (West 1994)). Thereafter, Julian filed a motion to dismiss the cause of action based on *res judicata*. The trial court denied that motion.

Given the circumstances surrounding the March 25, 1991, order, we find that it clarified the March 14, 1991, order to address the dismissal of the case based on the court's inability to transfer the case from the Court of Claims. In that regard, we note that on March 25 the court considered only the issue of whether the case could be transferred. The court's finding that it could not transfer the case was in essence a ruling that it had no jurisdiction to transfer the case. Thus, we find that this basis was akin to a dismissal for lack of jurisdiction. Supreme Court Rule 272 provides that "[u]nless the order of dismissal or a statute of this State otherwise specifies, an involuntary dismissal of an action, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, operates as an adjudication upon the merits." (134 Ill. 2d R. 273.) We hold that the basis of the dismissal in the instant case falls under the lack-of-jurisdiction exception to Rule 273 and was therefore not an adjudication on the merits. We find *Greenfield v. Ray Stamm, Inc.* (1993), 242 Ill. App. 3d 320, relied upon by Julian, to be distinguishable. That case did not involve a complaint which stated that it was being filed merely to transfer a timely filed case that was pending in another jurisdiction. Accordingly, we hold that the plaintiff's claim was not barred by the doctrine of *res judicata*.

Having addressed the issues raised by Julian on appeal, we now turn to Korjenek's cross-appeal. Korjenek first argues that he is entitled to a new trial on the issue of damages because Julian's attorney improperly commented during his closing argument that Julian would be personally responsible for payment if a judgment was rendered against him. Specifically, Julian's attorney stated, "I don't think that it's fair that Joseph Julian for the next 50 years should

have to pay." At that point, Korjenek's counsel objected, and the trial court sustained the objection.

It is well settled that it is improper to inform the jury, either directly or indirectly, that the defendant is, or is not, insured against liability on a judgment that might be entered against him in a negligence action. (*Rush v. Hamdy* (1993), 255 Ill. App. 3d 352, 361; *Huber v. Seaton* (1989), 186 Ill. App. 3d 503, 507.) An uninsured defendant may not inform the jury of his lack of insurance or financially vulnerable position. (*Rush*, 255 Ill. App. 3d at 361; *Imparato v. Rooney* (1981), 95 Ill. App. 3d 11, 17.) To warrant reversal, however, the language utilized in a reference to defendant's financial condition must be reasonably understood to refer to the financial status of one of the parties and must result in prejudice to the complaining party. *Rush*, 255 Ill. App. 3d at 352.

We find that the statement about Julian paying "for the next 50 years," when considered in context, was a clear reference to Julian's personal responsibility and lack of ability to pay a judgment rendered against him. The comment was particularly egregious in view of the fact that the assistant Attorney General who represented Julian had previously filed a motion *in limine* to bar the introduction of evidence showing that the State would indemnify Julian, noting that such evidence would be highly prejudicial. Thus, aside from being improper, the complained-of comment was presumably false. The comment could only serve to appeal to the sympathy of the jury, and, under the circumstances, it constituted reversible error.

Our resolution of the foregoing issues renders it unnecessary to address the remaining issue raised by Korjenek's cross-appeal.

The judgment of the circuit court of Lake County with respect to the liability of Julian is affirmed; however, we vacate the damage portion of the judgment and remand the cause for a new trial on damages only.

Affirmed in part; vacated in part and remanded.

BOWMAN and HUTCHINSON, JJ., concur.