KATHY KASS, Indiv. and as Mother and Next Friend of Kelly Kass, a Minor, Plaintiff-Appellee, v. RESURRECTION MEDICAL CENTER, Defendant (Elio Vento *et al.*, Defendants-Appellants).

First District (3rd Division)   No. 1—99—1297

Opinion filed September 29, 2000.—Rehearing denied November 1, 2000.

Robert Marc Chemers, Alan J. Schumacher, and Scott L. Howie, all of Pretzel & Stouffer, Chtrd., of Chicago, for appellant Elio Vento.

Lord, Bissell & Brook, of Chicago (William C. Anderson III, Diane I. Jennings, and Ann K. Ford, of counsel), for appellant Ewa Zaburda.

A. Denison Weaver and Michael J. Laird, both of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:
There is one issue in this case: Did the trial court abuse its discretion when it found a defense lawyer's remark during closing argument was so improper it entitled the plaintiff to a new trial? We conclude the answer is yes. We reverse.

FACTS
On May 16, 1991, Kathy Kass (Kass) visited her obstetrician, Dr.

Elio Vento, and received confirmation that she was pregnant. On October 4, 1991, Kass underwent an ultrasound test, which revealed that she was carrying twins, both in breech position. This fact, combined with Kass' obstetrical history—she had two previous stillbirths, one due to the umbilical cord wrapping around the fetus' neck—led Dr. Vento to plan to deliver the twins by caesarean section. The operation was scheduled for December 9, 1991, the calculated due date.

On December 8, 1991, Kass began experiencing labor pains. After consulting with Dr. Vento, Kass went to Resurrection Medical Center. Kass arrived at the Medical Center at 12:30 p.m. and was met by Dr. Vento. He proceeded to assess the situation, applying fetal monitors to Kass' abdomen.

From the monitors it was determined that one of the twins—Kelly—was showing poor heart rate variability and some late decelerations. Though Dr. Vento found the monitor tracings to be cause for concern, he did not believe the tracings were indicative of significant fetal distress necessitating a rush or emergency caesarean section. Dr. Vento decided, however, to perform the caesarean section that day, as soon as possible.

At 1:35 p.m., Kass was taken to the operating room. The anesthesiologist, Dr. Ewa Zaburda, was called to the delivery area. She consulted with Dr. Vento and, based on various considerations, they determined an epidural anesthesia would be appropriate. At 2:07 p.m. Dr. Zaburda began administering the epidural. At 2:30 p.m. Dr. Vento began the operation. Kelly was delivered at 2:34 p.m.

At birth, Kelly's APGAR scores were within acceptable range. Blood tests, however, showed her blood pH was slightly below normal and her platelet count was low. Eighteen hours after birth, Kelly had a seizure. She was transferred to Loyola Medical Center, where it was later determined she suffered from cerebral palsy.

Kass filed suit against Resurrection Medical Center, Dr. Vento, and Dr. Zaburda, alleging Kelly's cerebral palsy had been caused by their negligent acts or omissions. Specifically, it was alleged Dr. Vento breached the standard of care by failing to deliver the twins earlier in the pregnancy; by failing to recognize an emergency situation existed based on Kelly's monitor tracings; and by failing to perform an emergency caesarean section operation soon after receiving the monitor tracings.

Dr. Zaburda, it was alleged, added to the delay of Kelly's delivery by choosing to administer an epidural anesthesia, which requires 30 minutes to take effect, rather than a general anesthesia, which takes effect in a matter of minutes.

During a three-week trial, the jury heard the testimony of several expert witnesses. The defense experts, as well as the plaintiff's experts, all opined Kelly's injury, in light of all the evidence, had not resulted from a single hypoxic event but, rather, had most likely resulted from a continuous, chronic hypoxia, which began anywhere from two to three days to two to three weeks prior to birth. They reached this determination based on the fact that Kelly's muscle tone, APGAR scores, and ability to breathe on her own were normal at birth, indicating that Kelly was under no appreciable fetal distress at birth. At the same time, however, blood tests done on Kelly's blood at birth revealed a high level of nucleated red blood cells and low platelet count—both conditions that indicated a chronically low oxygen intake. Additional testing, such as CT scan, MRI, and head ultrasound films, confirmed, in the defense experts' opinions, that Kelly's brain damage was sustained over days or weeks prior to birth.

In opposition, Kass' experts, Dr. Lerer and Dr. Gore, testified hypoxic ischemic encephalopathy at the time of birth contributed to Kelly's cerebral palsy. While they admitted Kelly's fetal monitor tracings showing decreased variability and late decelerations upon her arrival at the hospital, which supported the notion that Kelly was already hypoxic when Kass arrived at the hospital, plaintiff's experts were reluctant to say how long the hypoxia might have been present prior to birth. In their opinion, Kelly's brain damage would have been less severe had she been delivered sooner.

After the evidence was presented, the jury heard closing arguments. Plaintiff's counsel began by stating Kelly was not present in court

> "even though this is probably the most important day of her life because what you decide today is going to determine how she's going to live for the rest of her 73 or 74 years of life ***.
>
> Now let me remind you of the burden you have in this case, that is, this is Kelly's only day in court. There is no second chance. Whatever you decide today as to what she's entitled to, that's it for the rest of her life. If you decide there is a sum of money you agree that she is entitled to, that's what she's going to have to live with for the rest of her life. That's your burden."

Later in plaintiff's closing argument, counsel accused the defense of "creat[ing] evidence to cheat a crippled child of what she's due" and characterized the defense witnesses as "a dog and pony show."

The three defendants each presented closing argument—first the hospital, then Dr. Vento, and, finally, Dr. Zaburda. At the close of a lengthy closing argument, Dr. Zaburda's lawyer said:

> "Mr. Weaver said that Kelly only has one day in court, but I must

tell you Dr. Zaburda only has one day in court, too, and that's today. The decision that you make will affect her professionally and personally."

An immediate objection was made by plaintiff. The court responded, "Sustained. Strike that."

After closing arguments, the court instructed the jury. One of the instructions told the jury it was to disregard any statements that were not based on the evidence. After deliberating, the jury returned a verdict in favor of all three defendants.

Kass filed a posttrial motion, seeking a new trial. Plaintiff's main argument was that reversible error was caused by Dr. Zaburda's lawyer's remark in closing argument that the "decision that you make will affect her professionally and personally." This remark, said plaintiff, was an improper appeal to the sympathy of the jury and suggested, incorrectly, that Dr. Zaburda had no insurance and would be affected financially.

The trial court agreed the remark was improper and set aside the jury's verdict, but only as to Dr. Vento and Dr. Zaburda, not the hospital. The trial court made it very clear it was granting a new trial against these two defendants solely on the basis of the remark made by Dr. Zaburda's lawyer in closing argument. The court said it was improper, in a medical malpractice case, for a doctor to argue the impact of a verdict on his/her professional reputation. "Secondly," the court said, "when you add the word personally *** it could be—if the professional part is understood, then maybe it means money-wise or financially."

Based on this reasoning, the court ruled it was "not going to let it stand." The court said it reached this conclusion, not only because of the impropriety in this case, but because of the possible effect on future cases if the court let the verdict stand.

Dr. Vento and Dr. Zaburda appeal from the order granting plaintiff a new trial. Illinois Supreme Court Rule 306 (134 Ill. 2d R. 306) provides jurisdiction to hear this appeal.

DECISION

There is no doubt the trial court granted plaintiff's motion for new trial solely on the basis of the single remark by Dr. Zaburda's lawyer in closing argument. We consider whether the trial court clearly abused its discretion when it granted plaintiff's motion for new trial. See *Maple v. Gustafson*, 151 Ill. 2d 445, 455, 603 N.E.2d 508 (1992) (A trial court's decision to grant or deny a new trial will not be overturned unless the reviewing court finds the trial court clearly abused its discretion).

Our research has uncovered four cases where reviewing courts have considered the prejudicial impact of closing remarks that suggested to a jury an adverse verdict against the defendant would impugn the defendant's professional reputation.

The first case is *Torrez v. Raag*, 43 Ill. App. 3d 779, 357 N.E.2d 632 (1976), a medical malpractice action. In *Torrez*, defense counsel said in closing argument:

> " 'I am concerned though, and I am seriously concerned, because this man's right to practice medicine by reason of this lawsuit—' " *Torrez*, 43 Ill. App. 3d at 782.

Plaintiff's counsel interrupted with an objection. The trial court sustained the objection and added, "It is not an item of dispute here, Mr. Clancy." 43 Ill. App. 3d at 782. The remark was not stricken. No further remarks of this nature were made. The jury returned a verdict in favor of the defendant doctor, but the trial court set aside the verdict and granted plaintiffs a new trial, saying it was " 'taking into account the manifest weight of the evidence, the attitude and demeanor of the witnesses, [and] the arguments of counsel in their closing remarks' " to find prejudicial impact on the jury. *Torrez*, 43 Ill. App. 3d at 782.

Though the question was one of first impression, the reviewing court upheld the trial court's decision:

> "We do not feel that the trial court abused its discretion in finding the remark to have prejudiced the jury, particularly in view of the close nature of the evidence in this case, and we therefore do not find that the court abused its discretion in ordering a new trial since there was a showing that the verdict, though perhaps not wholly unwarranted by the evidence, resulted from passion or prejudice." *Torrez*, 43 Ill. App. 3d at 783-84.

The next time the issue was considered was in *Mast v. Krusemark*, 83 Ill. App. 3d 107, 403 N.E.2d 743 (1980). In *Mast*, a legal malpractice action, defense counsel said in closing argument, "The professional reputation of Mr. Krusemark is at stake, too." 83 Ill. App. 3d at 112. The remark was objected to, but the objection was overruled.

When ruling on plaintiff's posttrial motion for new trial, the trial court specifically held the jury's verdict was not against the manifest weight of the evidence and, for that reason, denied the motion. Plaintiff appealed.

On review, the court rejected arguments that *Torrez* mandated reversal. Though the remark was error, the court said, it was harmless because the "statement was [not] adequate, by itself, to produce any significant prejudice to the plaintiffs." *Mast*, 83 Ill. App. 3d at 113.

Next came *Rush v. Hamdy*, 255 Ill. App. 3d 352, 627 N.E.2d 1119 (1993). In *Rush*, defense counsel made two remarks in closing argument to which plaintiff objected. The first remark was:

"Dr. Hamdy has his professional reputation on the line here. If he has seemed uptight or excited at times, please consider that he has a lot at stake here. His professional reputation is very important to him." 255 Ill. App. 3d at 358.

The judge in *Rush*, unlike the judge in the instant case, overruled the objection.

Defense counsel later argued Dr. Hamdy was not "here to be hit with a money verdict." 255 Ill. App. 3d at 360. The trial court sustained an objection to this remark, but did not strike it. The jury returned a verdict in favor of the defendant, Dr. Hamdy, and plaintiffs appealed.

On appeal, the reviewing court found both remarks violated orders *in limine*. Moreover, said the court, the remarks were improper and constituted reversible error because they interjected improper elements into the case and appealed to the passions and sympathy of the jury. For these reasons, plaintiffs did not receive a fair trial.

More recently, in *Dodds v. Western Kentucky Navigation*, 297 Ill. App. 3d 702, 710, 697 N.E.2d 452 (1998), defense counsel made "inappropriate references to ethical violations and professional disciplinary actions" during closing argument. Again, the court found such remarks improper because they "interjected irrelevant issues into the case." *Dodds*, 297 Ill. App. 3d at 710. In *Dodds*, the verdict was found to be against the manifest weight of the evidence and for that reason a new trial was ordered.

■ There is a principle to extract from the cases: any suggestion that an adverse verdict might have negative impact on a defendant's professional reputation is an appeal to the jury's passion and prejudice, an improper purpose. Dr. Zaburda's lawyer's statement—"The decision that you make will effect her professionally and personally"— was such a suggestion even though the word "reputation" was not used. We do not share plaintiff's view that the reference to effecting Dr. Zaburda "personally" was an inference that she was uninsured.

We understand the statement was intended to respond to plaintiff's repeated appeals for juror sympathy on behalf of Kelly. Defense counsel had the right to defend against those remarks. But she went too far.

The question we must answer is whether this single improper remark, successfully objected to by plaintiff and promptly stricken from the record, supports the trial judge's decision to take away the jury's verdict in favor of Doctors Zaburda and Vento.

■ We do not believe the question can be answered without examining the impact the remark may have had on the jury in this case. That is, could the jury's verdict in favor of all three defendants have been the result of passion and prejudice created by the single

remark? The trial judge did not do that analysis. We have. Doing so, we note that sustaining an objection and ordering an improper comment stricken generally is a prompt cure for any prejudicial impact that may have been caused. See *People v. Alvine*, 173 Ill. 2d 273, 295, 671 N.E.2d 713 (1996); see also *People v. Baptist*, 76 Ill. 2d 19, 30, 389 N.E.2d 1200 (1979).

■ Here, it was a brief remark, coming at the end of defense counsel's argument. No motion for mistrial was made when the remark was stricken. The jury had heard 9 days of trial testimony from 16 witnesses, 11 of them medical experts, including the two defendant doctors. While there was enough evidence to find in favor of the plaintiff, the defendants mounted a strong defense.

We find it difficult to see how defense counsel's offending remark could have been enough to tip the scales. After all, the jury found in favor of the hospital and both doctors. The remark referred only to Dr. Zaburda, against whom the evidence was far from persuasive.

Based on the entire record we find, as the court did in *Mast*, the improper statement during argument could not have caused significant prejudice to the plaintiff. In the absence of prejudice that denies a party a fair trial, it becomes a clear abuse of discretion for the trial court to grant a new trial where the evidence supports the jury's verdict. See *Maple v. Gustafson*, 151 Ill. 2d at 455.

CONCLUSION

We conclude the trial court erred when it granted plaintiff a new trial.

We reverse the trial court's order granting plaintiff a new trial, and the jury's verdict in favor of Dr. Zaburda and Dr. Vento is reinstated.

Reversed.

HALL, P.J., and BURKE, J., concur.