2020 IL App (2d) 190684
No. 2-19-0684
Opinion filed December 7, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL KONEWKO, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 15-L-692 |
| | ) | |
| ADVOCATE HEALTH AND HOSPITALS | ) | |
| CORPORATION, d/b/a Advocate Good | ) | |
| Samaritan Hospital, | ) | Honorable |
| | ) | David E. Schwartz, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff, Michael Konewko, filed a medical malpractice suit against defendant, Advocate

Health and Hospitals Corporation, d/b/a Advocate Good Samaritan Hospital (Advocate), for

injuries resulting from a commode incident. Following a nine-day trial, with numerous experts

addressing both the standard of care and proximate cause, the jury returned a verdict for Advocate.

The jury also answered a special interrogatory in the negative, finding that Advocate's agents did

not act negligently. Konewko moved for a new trial, based on Advocate's improper closing

argument. Advocate had repeatedly painted its agent, nurse Lisa Begler, as a sympathetic figure

who would have to work years to earn the amount of money that Konewko requested in damages.

The court denied the motion, in large part because Begler was not a party to the case. Konewko also moved for a judgment notwithstanding the verdict (JNOV) or a new trial, based on the manifest weight of the evidence, and the trial court denied the motions.

¶ 2     Konewko appeals, arguing as he did in his posttrial motion. Primarily, he asserts that he is entitled to a new trial due to Advocate's repeated improper comments during closing argument. We agree. The evidence in this case was closely balanced, making it highly probable that the repeated improper comments during closing argument compromised the integrity of the verdict. See *Koonce v. Pacilio*, 307 Ill. App. 3d 449, 455 (1999). The comments were intended to inflame the passions of the jury, even though the comments concerned Advocate's agent, rather than Advocate itself. The trial court abused its discretion when it found that the comments could not warrant a new trial, because they pertained to a party's agent, rather than the party itself. We reject Konewko's argument for a JNOV, and we will not address Konewko's alternative argument for seeking a new trial, based on the manifest weight of the evidence. We reverse and remand for a new trial.

¶ 3                              I. BACKGROUND

¶ 4     On October 28, 2010, Konewko, then age 57, underwent back surgery at Advocate, which involved a laminectomy and the removal of a synovial cyst (first surgery). Following the first surgery, he experienced increased leg weakness. On October 30, 2010, while Konewko was still an inpatient at the hospital, Begler was helping Konewko get to the commode when Konewko's bottom hit the commode in an uncontrolled descent. This caused him great pain. His leg weakness increased to the point of feeling "dead." On October 31, 2010, Konewko underwent a second surgery to investigate whether a screw was pressing on his nerves and causing the leg weakness (second surgery or revision surgery). During the second surgery, the doctor removed a screw, and,

over time, Konewko's leg strength increased. Konewko was then sent to Marianjoy Rehabilitation clinic, where he had to learn to walk again. At Marianjoy, he suffered a deep vein thrombosis (DVT) blood clot and, on November 19, 2010, an infection. The infection required a third, emergency surgery. Shortly after the third surgery, the hospital released Konewko as an outpatient, where he continued to improve. One year after the first surgery, Konewko's leg strength was rated a four-plus out of five.

¶ 5     Konewko filed a medical-malpractice suit against Advocate. His theory of the case was that Advocate's agent, Begler, did not meet the standard of care in that she did not (1) use an assistive device, such as a rolling walker or a gait belt, in getting Konewko to the commode; (2) involve a second person while getting Konewko to the commode; or (3) instruct and cue Konewko during his attempt to sit on the commode. As a result of this conduct, Konewko *fell* onto the commode. Konewko cried out in pain and felt his "hardware" move. The fall necessitated a second surgery to ensure that the hardware had not moved and it caused additional leg weakness. Instead of the four hospital days and 18 outpatient physical therapy visits predicted heading into the first surgery, Konewko endured a second surgery and was sent to Marianjoy Rehabilitation Center to recover for 20 to 25 days. Moreover, Konewko has experienced a reduced ability to participate in his former activities. One year after the first surgery, Konewko had decreased pain but increased weakness. Although his strength was rated a four-plus out of five, his activities continued to be restricted. (Konewko conceded that the DVT blood clot, the infection, and the third surgery might have resulted from the first surgery and not the second surgery or the commode incident.)

¶ 6     Advocate's theory of the case differed. That is, Begler met the standard of care in getting Konewko to the commode and in instructing and cuing him to sit. In fact, she *did* use a walker,

and she *did* cue him to sit. Konewko did not *fall* onto the commode. Rather, he was able to assume a squatting position before he descended in a "*hard sit*" onto the commode. Moreover, the second surgery was not occasioned by Konewko's descent onto the commode. Rather, Konewko's leg weakness, which caused the uncontrolled descent in the first place, was a sign that the first surgery had not been entirely successful. The first surgery likely caused nerve damage and, correspondingly, leg weakness. This is a known risk of the first surgery, because it is difficult to extract a cyst without damaging a nerve. Also, the nerve damage could have been caused by an infection, the symptoms of which Konewko began experiencing *before* the commode incident. Moreover, post-therapy, Konewko experienced an increased ability to participate in activity, as compared to his presurgery state, when pain precluded him from walking more than 75 to 100 meters. It was unrealistic to expect to return to the active state he enjoyed as a younger man prior to his back problems.

¶ 7    Before trial, the trial court ruled on the parties' motions *in limine*. Specifically, the court "barr[ed] any attorney or witness from making reference to, comments about, [and] barr[ed] any evidence which relates to the wealth, poverty or financial status of any party including reference to any other Advocate facility for purposes of showing wealth of the party." It also found that "[i]t is prejudicial error to ask a jury to put itself in the position of a party." The case proceeded to trial.

¶ 8                          A. Konewko's Initial Symptoms and the First Surgery:

Testimony from Konewko and Dr. Mataragas

¶ 9    Konewko testified that, prior to his initial back problems at age 57 in August 2010, he had been an active person. He enjoyed bowling, golfing, family volleyball, performing lawn and home maintenance, long walks with his dog, and bird hunting with his dog. He worked 60 hours per

week as a general practice attorney. Sometimes, in preparing for a trial, he worked 80 hours per week.

¶ 10    In August 2010, Konewko and his wife were staining their deck. His lower back began to "bother" him, and he went to see a chiropractor. At first, he obtained relief. However, in September 2010, he began to experience pain run down his front left thigh. The pain kept getting worse. It interfered with walking and standing.

¶ 11    On October 13, 2010, Konewko obtained an MRI on the advice of his primary care physician. Based on the results of the MRI, Konewko was referred to Dr. Nicholas Mataragas. After the consultation with Dr. Mataragas on October 20, 2010, it was decided that surgery was the best option. Konewko's pain was so bad that he could walk only very short distances, like 75 to 100 meters.

¶ 12    Dr. Mataragas testified that the MRI showed that Konewko had a "very large" synovial cyst pushing on the nerves of his spine. Konewko also had spinal stenosis, which is a pinching of the nerves, and spondylolisthesis, which is an instability in the spine where one bone shifts forward relative to another.

¶ 13    Following the MRI, Konewko decided to move forward with surgery. It would involve a laminectomy and a fusion, using screws and rods, located at the L2 to L5 portion of the spine. The lamina is a wing-shaped piece of bone covering the posterior aspect of the nerves. In a laminectomy, the doctor removes the back portion of the lamina enclosing the nerves, allowing the nerves to migrate posteriorly and "unsquish" themselves. "So it's like giving a convertible top to your spine. We just take off the top of it." After removing the lamina, the doctor can reach the synovial cyst. Finally, the fusion is necessary to provide stability to the spine following the removal of the lamina.

¶ 14    In Dr. Mataragas's view, the October 28, 2010, surgery went smoothly; nothing unexpected occurred. During the surgery, the surgical team monitored Konewko's nerves, and it did not appear that any "problem or consequence with the nerves" occurred. He expected Konewko to remain in the hospital for three to four days, before participating in 18 outpatient physical-therapy sessions. With any spinal surgery, however, even if the surgery goes as planned, the risks are infection, bleeding, paralysis, nerve-root injury, death, failure of fusion, failure of improvement, and the need for further surgery.

¶ 15                    B. Events Preceding and Including the Commode Incident:

                    Therapy Notes and Testimony from Begler and Konewko

¶ 16    Notes from October 29, 2010, by physical therapist J.C. Sales show that a gait belt was used to ambulate Konewko. Also, Konewko's knee buckled during the therapy session. Konewko had been using a walker at the time, so he caught himself and did not fall. Sales ordered a knee brace for Konewko. On October 30, 2010, nurse Kandice Vancura cared for Konewko during the 8 a.m. to 3 p.m. shift. She and another nurse also used a gait belt to help Konewko out of bed. Later that day, Konewko's physical therapy session was cut short, due to fluid leakage from his incision area. The bed sheets were soaked and had to be changed.

¶ 17    Begler testified that she began her shift at 3 p.m. She served as a float nurse in the progressive-care unit, where all four of her patients for the day's shift, including Konewko, were located. When Begler began her shift, Konewko was engaged in physical therapy. Begler did not have a specific memory of the beginning of her shift, but, per custom and practice, she would have received a briefing from Vancura through words and/or notes. At that time, she also would have noticed that Konewko was classified as a high fall risk, based on his chart, the notation on the door to his room, and his arm band. More specifically, Vancura informed Begler that, at 9 a.m., early

in Vancura's shift, Vancura had determined that Konewko required a gait belt when walking. Konewko had also been assessed as "assist to staff," which meant that a second nurse was required to move Konewko, whether it be to change his position in the bed or to walk him to the commode.

¶ 18    From 3 p.m. until 8:10 p.m., Konewko had been resting in bed, so Begler did not have occasion to update Vancura's assessment. However, Begler had been making her own informal assessment of Konewko's status since he returned from physical therapy. She found Konewko to be alert, oriented, and able to follow commands. She also performed a strength assessment at 4:10 p.m. During the strength assessment, she asked Konewko to lift his legs off of the bed. Konewko demonstrated good movement and strength. However, he had lingering numbness, as ascertained when she pressed her finger onto his leg.

¶ 19    At 8:10 p.m., Begler performed her first formal fall-risk assessment, known as the Hendrich II. At that time, Konewko appeared to be suffering from dizziness. Begler believed that she took Konewko's vital stats. Also, Konewko performed the "get up and go" test, in which he sat on the edge of the bed with his legs on the floor and attempted to stand on his own. It took him several attempts to stand, but he was ultimately successful.

¶ 20    At 9 p.m., Konewko asked to use the commode, which was located four to five steps from the bed. The commode was of an ordinary height, and it did not have a high seat for those with disabilities. There were no railings near the seat. Begler asked Konewko if he was still feeling dizzy, and he said no. Begler decided to use a walker to help Konewko reach the commode. She did not agree with Vancura's 9 a.m. assessment that a gait belt and/or an assist to staff were needed. Konewko reached the commode successfully. He turned to sit. After sitting halfway down, he came down hard on the seat, and he cried out in pain. He asked to be left alone to collect himself.

¶ 21    Begler documented the hard sit in the information system shared by Konewko's multidisciplinary team. Based on Begler's entry, Konewko's doctor ordered X-rays. The X-ray results were still pending at the end of Begler's shift, but they came back to show normal alignment.

¶ 22    Begler did not document the use of a walker in the information system. Similarly, during a 2012 deposition, she did not mention that Konewko had used a walker to reach the commode. Begler first mentioned the walker in a 2017 pretrial disclosure. Konewko's counsel asked Begler, in a tone noted as argumentative by the court, "where *** this walker went flying to[?]" when Konewko descended to a hard sit. Shortly thereafter, while Konewko's counsel was questioning Begler about the walker, the court, *sua sponte*, warned: "Hang on one second, okay, [counsel]. You are a gentleman, [opposing counsel] is a gentleman, but let's give this witness a little space, okay? I don't want you getting that close to her."

¶ 23    During cross-examination, Begler demonstrated how she helped Konewko go from the bed to the commode. She got up from behind the witness bench and used a standard walker as would have been found in Konewko's room. The jury was also shown a picture of the commode. Begler demonstrated that she helped Konewko stand up by placing her arm under his shoulder. She said that Konewko placed his hands on the walker and took a few steps to the commode. Begler helped Konewko turn and sit. She had one hand on him at that time. She instructed him to begin sitting. When he was halfway down, he descended to a "hard sit" onto the commode. He cried out in pain. He told Begler that he "felt something pop." However, he did not report a "significant number" on the pain scale. When Konewko was safely back in bed, he told Begler that he was going to sue the hospital. This comment stuck with her.

¶ 24    Begler addressed the fact that she did not document her use of a walker in her patient notes or in her 2012 deposition. It was a simple omission. She had earlier stated that she was not directly asked in the deposition whether she used a walker. She had never given a deposition before. If she had not used a walker, she would have "no problem" candidly informing the jury as much.

¶ 25    Begler further stated that she was on the "falls" committee, a position for which she volunteered and was then elected by her peers to hold. "Safety is always number one" with her. Based on her 4:10 p.m. assessment of Konewko's strength, she "felt that he had the full mobility and full strength to safely transfer *** to the toilet."

¶ 26    Konewko testified that he remembered only certain events in the days following the first surgery. Specifically, three events, all occurring on October 30, stuck in his mind: (1) in the morning, two nurses helped him walk a couple of steps until his knee buckled, (2) in the afternoon, a fluid-leakage incident, and (3) in the evening, the commode incident. Also, Konewko recalled that he suffered severe headaches following the surgery.

¶ 27    As to the incident involving the two nurses, Konewko recalled getting into a sitting position. He put on a back brace. The two nurses, one on each side, helped him stand up. He walked a few steps, his leg buckled, and the two nurses put him "right back" to bed. He did not remember whether the nurses used any devices, such as a walker or a gait belt.

¶ 28    Next, as Sales began the physical therapy session, it was noticed that Konewko's drain was dislocated and leaking onto the bed. The bed was soaked, and the linens had to be changed. Konewko remembered the bed being soaked, but he did not remember the linens being changed. As for the therapy session itself, "I do not remember what I did with [Sales] or if I got up. I do not remember that."

¶ 29    Finally, as to the commode incident, Konewko had been told that, in order to be discharged from the hospital, he had to pass a bowel movement. When he thought he had to go to the toilet, he pressed the call button. Begler came into the room and said, "What's the matter?" Konewko said he had to use the toilet. Begler said, "Okay."

¶ 30    Konewko performed a "log roll" prior to sitting up in the bed. He had no memory of whether he performed the log roll independently or whether Begler helped him. He remembered sitting up and putting on the back brace, because that was a "production." Once sitting, his legs dangled off the bed. Begler stood on his left side. He slid his buttocks off the bed until his feet hit the floor. He stood up straight. He did not remember if Begler helped him get off the bed or stand. Then, when he was standing facing the commode with his back to the bed, Begler grabbed his wrist and said, "Let's go." Begler started moving toward the toilet, and Konewko followed her. Begler did not use any devices—no gait belt, no walker. The commode was four or five feet from the bed. He approached it with a slow shuffle, following behind Begler, who still had his wrist. He reached the commode without incident.

¶ 31    Once in front of the commode, Begler said, "Turn around." This was the only instruction that she gave. Begler remained on Konewko's left side. Konewko began to turn toward his left. Konewko recounted:

> "As soon as I started turning, [Begler] let go [of my wrist.]
>
> * * *
>
> I kept on turning and I don't know how far I got, but my left leg buckled. I then went straight down and hit the toilet hard and I was kind of like at a 45-degree angle. I remember that.

While I was shuffling and turning, I was still straight up. Once my knee buckled, I lost all control.

My left butt cheek hit the side of the toilet. You know, not the middle part but the side part. I hit like, as I said, at a 45-degree angle.

[A]t first I was flailing trying to keep my balance. And after that I hit the toilet. I screamed and I felt a popping sound in my back and I felt movement in my back where my hardware was."

¶ 32    After Konewko hit the commode seat, he was in "substantial" pain. He asked to remain sitting so that he could compose himself. He sat for 3 to 10 minutes. Then, he called out for help getting back into bed. Begler returned with another nurse. The two nurses stood on either side of him, helping him get up and helping him get in bed. Walking back to bed, his left leg felt "dead" and was "nonfunctional."

¶ 33    In bed, "[he] hurt. [He] really, really hurt." He was now in "extreme" pain. The pain was located in the surgical area. He called his wife, who told him to call his primary-care physician. His primary-care physician said that he would call Dr. Mataragas.

¶ 34    A few minutes later, Begler came into the room and told him that he would be receiving X-rays. After the X-rays, he fell asleep. He remembers Begler coming back into his room at 2 or 3 a.m. He asked what she was doing there. He thought her shift ended at 11 p.m. She said she just wanted to see if he was okay.

¶ 35    The next day, Dr. Mataragas told Konewko that a second surgery was needed to make sure the hardware had not moved. This upset Konewko: "I did not want another surgery. This was a very painful surgery in the first place. And after he told me, you know, what was going on, I broke down and started crying."

¶ 36    Konewko disputed Begler's testimony that he threatened to sue the hospital before knowing whether he was injured: "I'm the former chairman for the ethics committee for the Du Page County Bar Association. And when I'm mentoring attorneys, I don't tell them you threaten people with lawsuits. And in my own private practice, I do not do that. I never said those words."

¶ 37                    C. Standard-of-Care Experts: Levin and Shriver

¶ 38    Konewko's expert, Barbara Levin, was a registered nurse in the orthopedic-trauma unit at Massachusetts General Hospital in Boston. Upon review of the record and deposition testimony, she determined that Begler deviated from the standard of care by failing to (1) investigate why physical therapy had ordered a knee brace; (2) appreciate that, up until her shift, the other nurses had used a two person assist, a gait belt, and/or a walker; (3) take Konewko's vital signs, when, at 8:10 p.m. he told her that he was dizzy;[1] and, (4) most critically, provide more than a minimal assist. Levin defined a minimal assist as affording a 25% assist. Levin opined that a reasonably prudent nurse would have provided more than a 25% assist. In walking Konewko to the commode, a reasonably prudent nurse would have had two people present *or* utilized a walker. In helping Konewko turn, a reasonably prudent nurse would have had two people present *and* used a gait belt, as Konewko had no railings to hold. A reasonably prudent nurse also would have given verbal cues and step-by-step instructions.

¶ 39    Advocate's expert, Kydie Shriver, was a licensed nurse and a director of the orthopedic unit at Rush University Medical Center in Chicago. A large portion of her work in the unit included patient transfers to the toilet. She believed that Begler met the standard of care, because Begler performed an independent assessment of Konewko, determined that he needed a minimal assist,

___

[1] Begler believed that she *did* take Konewko's vital signs. This was a disputed fact.

and used a minimal assist. Every postoperative patient is considered a high fall risk, but it was proper for Begler to make an independent assessment of Konewko, because a patient's status might change from shift to shift. Begler performed a proper assessment where she checked that Konewko's vital signs were stable, made certain that Konewko was alert and oriented before transferring him, checked Konewko's leg strength and stability, and made Konewko move slowly. Under these circumstances, a second nurse was not necessary. It was appropriate to transfer Konewko with a minimal assist only. A minimal assist means that the nurse has his or her hand on the patient at all times and is ready to assist up to 25% of a patient's body weight.

¶ 40    On cross-examination, Shriver clarified that a minimal assist is different from a standby assist. During a standby assist, the nurse does not touch the patient. Rather, he or she stands near the patient, anticipating the patient's needs. Here, Konewko required more than a standby assist, and a standby assist in this case would fall beneath the standard of care.

¶ 41                D. Causation Testimony: Drs. Mataragas and Deutsch

¶ 42    Dr. Mataragas testified that he learned of the commode incident on the evening of October 30, 2010, or the morning of October 31, 2010. Konewko complained to him, or to his physician's assistant, of new weakness in his quad muscle. Konewko's leg strength was rated a two out of five, which means that the leg cannot fully extend against gravity. For context, a three out of five means that the leg can extend against gravity, but, as soon as the leg meets additional resistance, the knee buckles.

¶ 43    During the second surgery, Dr. Mataragas removed the L3 screw to remove any "possible" impingement on the nerve. At that time, he also viewed the rest of the spine. "There wasn't *** anything obviously wrong in the area." Dr. Mataragas did not have an "ah-hah moment" confirming that the screw had damaged the nerve.

¶ 44    On November 19, 2010, Dr. Mataragas went to Marianjoy to follow up with Konewko. There, he noticed a wound infection. This required an emergency third surgery to clean out the infection. It was important to clean out the infection immediately, because infections can cause nerve damage. Dr. Mataragas was confident that he eradicated all signs of infection at that point. Konewko was discharged from the hospital shortly thereafter.

¶ 45    Dr. Mataragas saw Konewko as an outpatient on December 3, 2010; February 16, 2011; June 1, 2011; and December 16, 2011. In December 2010, Konewko was progressing "nicely." He was regaining strength in his quad and moving it on his own. He went from the wheelchair to the examining table "on his own with very limited help." In February 2011, Konewko had improved significantly, no longer needed a wheelchair, and was ambulating with a cane. His leg strength was a four-minus out of five. In June 2011, Konewko's pain had improved, but he had lingering numbness and tingling near his left knee. Although he was still using a cane, his leg strength on that day was a five out of five. In December 2011, Konewko reported that he was "doing much better." He was able to go Christmas shopping. His leg strength was a four-plus out of five. The medical records were silent as to whether Konewko was still using a cane, and Dr. Mataragas did not recall. Dr. Mataragas did not see Konewko after December 2011.

¶ 46    Dr. Mataragas opined that the commode incident was "causally related" to the need for the revision surgery. He testified that, heading into that surgery, his "working diagnosis" was that the commode incident caused one of the screws to move. The surgery extended the length of Konewko's hospital stay. Similarly, the commode incident was "causally related" to the Marianjoy stay.

¶ 47    Dr. Mataragas had no opinion as to whether the commode incident was related to Konewko's infection, which was treated on November 19, 2010, or the DVT blood clot. Those problems could have been outgrowths of the first surgery.

¶ 48    When asked if Konewko's present limitations could be related to the 2011 leg weakness, Dr. Mataragas answered:

> "Given that I haven't seen [Konewko] in so many years, I don't know if there's been other things that could have occurred to [him], but if it's the same as it was eight years ago and he was having difficulty walking then because of some quad weakness, that could certainly be the case."

Advocate objected to the question and moved to strike the answer as speculative, but the court overruled the objection and allowed the answer.

¶ 49    On cross-examination, Dr. Mataragas agreed that, overall, he was "very satisfied with [the] course of treatment, given that [Konewko] had come to [him] back in the fall of 2010 with significant [pain] in the area and now, as of December 2011, he's got a functional quad." Dr. Mataragas also conceded that, while the goal of the first surgery was to return Konewko home in four days, it is "not uncommon" to refer a patient to Marianjoy following spinal surgery. "Those [plans] have a way of changing," depending on input from the physical therapist, occupational therapist, and social worker. Finally, Dr. Mataragas confirmed that the initial problems that prompted the first surgery—spinal stenosis and spondylolisthesis—were degenerative, age-related conditions. Konewko underwent the first surgery at age 57, and Konewko is now age 66.

¶ 50    Dr. Mataragas was not able to confirm, during the second surgery, that the commode incident caused a screw to move. However, this would have been difficult to confirm, because, "by the time you remove the screw, you have no way of knowing where the screw was before."

Also, the team was working with a lateral cutout, and it is easier to see screw movement with a medial cutout. Still, he repeated, screw movement had been his "working diagnosis," based on Konewko's symptoms and the CT scan. (Dr. Mataragas did not use CT images to support his point. He only referred to them.) The working diagnosis remained a viable position because Konewko recovered after the removal of the screw. Dr. Mataragas agreed that, "as to the revision surgery, [he] went in *** out of an abundance of caution because [he] felt that the quad weakness was new and it was severe and [he] wanted to go in and see what was going on with respect to the nerve."

¶ 51     Dr. Harel Deutsch, Advocate's expert, opined that the removal of the synovial cyst during the first surgery, not the commode incident, caused Konewko to experience increased leg weakness. Given Konewko's increased weakness, the decision to proceed to a second surgery was not unreasonable, but the second surgery was not necessitated by the commode incident.

¶ 52     Dr. Deutsch explained that one of the main risks in removing a synovial cyst is damage to the nerve root. This is because the synovial cyst is often attached to the nerve root, and it is difficult to extract the cyst without damaging the nerve. Damage to the nerve root at the L2, L3 area of the spine might cause weakness in the quadriceps. Dr. Deutsch believed that this occurred following the first surgery, because the hospital records show that Konewko experienced increased leg weakness following the surgery. For example, his physical therapy notes show that Konewko needed a knee brace. If there had been no damage to the nerve root, Konewko would have been able to walk normally following the surgery. Thus, in Dr. Deutsch's view, Konewko was already injured prior to the commode incident. He expressed his opinion as follows: "[Konewko] has weakness in his leg after the [first] surgery and then that caused him to have difficulty walking and to sit hard on the commode, but that—*the sitting hard doesn't cause the injury, the injury caused him to sit hard*." (Emphasis added.)

¶ 53    Not only did the first surgery and the removal of the cyst cause nerve damage, but, according to Dr. Deutcsh, the first surgery led to an infection. The hospital records documented two telltale symptoms of infection: a significant amount of fluid leakage and severe headaches.

¶ 54    Dr. Deutsch did not believe that the hard sit on the commode caused Konewko's surgical screws to move. In front of the jury, he compared the X-ray taken immediately after the first surgery when the screws were installed to the X-ray taken after the hard sit. The screws had not moved. The following exchange occurred:

"[DR. DEUTSCH]: *** But you can see all the screws and all the screws are like the same overall alignment. In fact, the screws cannot really move relative to the overall construct unless there is some sort of failure of instrumentation that wasn't placed right. It's kind of like locking in place.

[ADVOCATE'S COUNSEL]: All right. And so what do these images tell you as to whether or not a screw moved as a result of the hard sit on the toilet?

[DR. DEUTSCH]: Well, the X-rays clearly showed there is no screw that was moved, and it's not possible that it was moved and there is no change in X-ray from before and after."

¶ 55    On cross-examination, Dr. Deutsch agreed that Dr. Mataragas's decision to proceed with the second surgery was not unreasonable, because Konewko had continuing leg weakness. In order to view the damaged nerve and "get to that area," Dr. Mataragas had to remove a screw. However, in Dr. Deutsch's view, that screw did not cause the nerve damage. He explained:

"[T]hat screw was[,] based on the CT[,] not in contact [with] any nerve and was appropriately placed by Dr. Mataragas [during the first surgery]. And that screw definitely did not move looking at the X-rays. Now, I think that in order to see the nerve that was

- 17 -

damaged at the time of the [first] surgery, Dr. Mataragas had to remove that screw to get at that area. And I then think that at that point he decided not to put it back in which was a reasonable decision."

¶ 56    Dr. Deutsch conceded that Dr. Mataragas's postoperative note did not mention any difficulty in excising the cyst due to it being stuck to a nerve. However, Dr. Deutsch clarified that the note did not mention the cyst at all, even though the cyst had clearly been removed. The cyst was mentioned in the preoperative report and in the pathology study.

¶ 57    Dr. Deutsch disagreed that Konewko faced the same risks going into the second surgery that he had faced in the first. "I mean, obviously since you're not really working around the nerves or taking a cyst out, et cetera, you may not really have much of a risk of nerve damage from that surgery."

¶ 58    On recross-examination, Dr. Deutsch further explained why he thought the nerve damage was caused by the removal of the synovial cyst during the first surgery rather than the commode incident. "Having nerve weakness and things of that nature *** is very common after these kinds of lumbar surgeries. I've not seen anyone have a commode accident before." Dr. Deutsch also noted that, after Dr. Mataragas performed the second surgery, Dr. Mataragas found no evidence that the screw had "anything to do with" the nerve damage.

¶ 59                     E. Motion for a Directed Verdict

¶ 60    At the close of evidence, Konewko moved for a directed verdict as to the standard of care only. The entirety of the oral motion, argument, and decision was as follows:

          "[KONEWKO'S COUNSEL]: I do actually have a motion I'd like to place on the record.

          THE COURT: Okay. Go ahead.

- 18 -

[KONEWKO'S COUNSEL]: I would move for a directed verdict on this issue of reasonable standard of care based upon Nurse Shriver saying that it would not be reasonably careful for a nurse who would only do standby assist and Nurse Begler indicating that that's exactly what she did on October 30 when dealing with Mr. Konewko.

THE COURT: I don't recall from Nurse Begler's testimony, but I'm going to deny the motion. I believe that's a question for the jury. Thank you."

¶ 61                                     F. Closing Argument

¶ 62     For the purposes of this appeal, the key points to Konewko's closing argument are as follows. Konewko informed the jury:

"[Y]our verdict must not be based on speculation, prejudice, or sympathy. ***

The concept of empathy, on the other hand, is a little different, and the concept of empathy and understanding what somebody has gone through can certainly play a role in this case."

¶ 63     Konewko disputed that Begler used a walker. He reminded the jury that Begler, who as a charge nurse trained others in documentation, did not herself document that she had used a walker. This is true even after, according to her, Konewko told her that he was going to sue the hospital. Also, Begler did not mention the walker in her deposition. Konewko then accused Begler of lying:

"She knows *** Levin *** is critical of [her] for failing to take proper precautions, [such as] using a walker ***.

She's aware of that. *So uh-uh, in our disclosure, I'm going to say I used a walker.*

It doesn't work that way. You know what, if you used it, put it in your record. If you used it, after you're describing everything you did at the deposition, say it in the deposition. That doesn't wash seven and a half years later.

*Careful and meticulous, question mark. Doubt it, exclamation point.* All right."

(Emphases added.)

¶ 64    Konewko requested $762,591 in damages, as follows: (1) $132,591 for medical bills, exclusive of the first surgery and the originally anticipated physical-therapy sessions; (2) $360,000 for pain and suffering from the time of the revision surgery to the present and into the future (with a statistical expectancy of reaching age 84); and (3) $270,000 for loss of a normal life, given that Konewko could no longer participate in certain activities, from the time of the revision surgery to the present and into the future (again, with a statistical expectancy of reaching age 84).

¶ 65    Advocate, in turn, opened by informing the jury that this was a serious matter:

"[You may not have liked my jokes throughout the trial.] But Lisa Begler's reputation as a nurse[,] the dedication that she does in and out, going back decades, starting as a patient care tech. Whatever you ultimately decide in this case as to whether Barbara Levin or Barbaralevin.com convinced you that she violated the standard of care, it's not a laughing matter, it's not something to be chuckled about, it's not something to be taken lightly.

We take it seriously. [Begler] takes it seriously, [Sales] takes it seriously. That's why we're here."

¶ 66    Next, addressing damages, Advocate argued:

"[ADVOCATE'S COUNSEL]: So you were asked to award *** almost $800,000.

And the first thing that popped into my mind was how many shifts, how many years, a nurse and a physical therapist in their life would have to work to earn $800,000.

[KONEWKO'S COUNSEL]: Objection.

THE COURT: That's sustained. The jury will disregard that comment."

¶ 67    Then, addressing Begler's conduct, Advocate argued:

"[ADVOCATE'S COUNSEL]: And I think you've learned it's not possible to document everything, that in real life nurses are not able to take someone to the bathroom and then go back to the chart at the nurse's station and type out exactly how they took the patient to the bathroom, where their hands were.

\* \* \*

\*\*\* What does professionally negligent mean? It means she was not reasonably careful.

*So put yourself in Lisa Begler's—*

[KONEWKO'S COUNSEL]: Objection.

THE COURT: Strike that.

[ADVOCATE'S COUNSEL]: I understand, [Y]our [H]onor.

Lisa Begler on the day of October 30, 2010, checks in for her 3 p.m. shift \*\*\* [proceeds to recount Begler's actions]." (Emphasis added.)

¶ 68    In concluding, Advocate argued:

"[ADVOCATE'S COUNSEL]: So what I would ask you to do \*\*\* is render a verdict in favor of the defense if [Konewko] did not prove [his] case.

And I would submit to you that exploiting people's lack of memory and having them on the stand for hours, and *basically openly mocking them—*

[KONEWKO'S COUNSEL]: Objection to form.

THE COURT: Hang on. Hang on a second.

That objection is sustained. Let's withdraw the phrase 'mocking them.'

[ADVOCATE'S COUNSEL]: *And then asking with all the expert witnesses that have made all this money in this case, then asking to award a sum of money that would take years for nurses and physical therapists—*

[KONEWKO'S COUNSEL]: Objection.

THE COURT: That's sustained and stricken from the record. Please, Mr. Johnson.

[ADVOCATE'S COUNSEL]: I'll submit to you \*\*\* that there was [no] negligence by [our] therapists and nurses and that you'll find in favor of [us]. I am confident that that will be the verdict." (Emphases added.)

¶ 69 During deliberation, the jury asked whether it could award medical expenses but find that Advocate's agents did not act negligently. Ultimately, the jury returned a verdict for Advocate. Additionally, it answered the following special interrogatory in the negative: "Before and at the time of the commode incident was the nursing and/or physical therapy staff of Defendant Advocate Good Samaritan Hospital negligent?"

¶ 70                                    G. Posttrial Motion

¶ 71 Konewko filed a posttrial motion, primarily arguing that Advocate's improper comments during closing argument warranted a new trial. Specifically, Konewko pointed to the following comments: (1) "how many years a nurse \*\*\* would have to work to earn $800,000"; (2) "[P]ut yourself in Lisa Begler's—"; (3) "basically openly mocking [witnesses]"; and (4) "asking with all the expert witnesses that have made all this money in this case, then asking to award a sum of money that would take years for nurses and physical therapists—." Konewko also complained of Advocate's opening comment about Begler's reputation. Konewko did not object to that comment at trial, believing that it "toed the line" and not knowing that the subsequent four comments would follow. As Konewko would later explain at the hearing, the four subsequent comments colored the

first comment, and all of the comments were a part of Advocate's persistent attempt to garner sympathy and bias in favor of its agent, Begler. Konewko also argued for a JNOV or a new trial, based on the manifest weight of the evidence.

¶ 72    Advocate responded that its closing-argument comments were not improper, because Begler was not a party to the case. It noted that, "to warrant reversal, the language utilized *** must be reasonably understood to refer to the financial status of *one of the parties* and must result in prejudice to the complaining party." (Emphasis added.) See *Rush v. Hamdy*, 255 Ill. App. 3d 352, 362 (1993). It argued that, even if the comments were improper, they were not unduly prejudicial, because (1) they constituted an insignificant portion of the proceedings and the evidence was more than sufficient to support the jury's verdict and (2) the trial court cured any impropriety by sustaining the objections and striking the comments.

¶ 73    Advocate explained at the hearing that its comments were not part of a calculated plan to inflame the jury's passion. Rather, it was trying to defend its witness, Begler, in the face of Konewko's disrespectful comments toward her. Konewko, in Advocate's view, implied that Advocate had instructed Begler to lie and say, "all of a sudden, no, I used a walker." Advocate believed that "somebody's performance as a witness should not be mocked." Advocate pointed to Konewko's comment: "Careful and meticulous, question mark. Doubt it, exclamation point. All right." Separately, Advocate did not mean to imply that Begler would be responsible for a money judgment. Instead, it referenced Begler's salary to illustrate that $800,000 in requested damages was "an outrageous sum of money." Moreover, it apologized for asking the jury to put itself in Begler's shoes:

> "[I]n retrospect I wouldn't have used that phrase. That wasn't where I was going with that.
>
> What I was trying to tell them was she goes into work—I was really essentially re-enacting

what she would have done during that particular day of her shift. *** I was making a standard of care argument."

Advocate did not believe that its comments were unduly prejudicial, in the context of a nine-day trial and a 45-minute closing argument, where it was trying to "stick up" for its witness.

¶ 74 Konewko disagreed that Begler's nonparty status mattered to the propriety of the comments. Begler was an agent of Advocate. Further, Konewko disagreed that the improper comments constituted an insignificant portion of the proceedings. Rather, he urged, they demonstrated Advocate's persistent attempt to inject an improper element into the case. As such, the resulting prejudice could not be cured simply by sustaining the objections to the comments. See *Torrez v. Raag*, 43 Ill. App. 3d 779, 783 (1976).

¶ 75 Konewko elaborated at the hearing that it considered Advocate's improper closing argument to be the "most disturbing" aspect of the case. He noted that Advocate's counsel knew the law and had been practicing with a "good firm" for over 20 years, and, thus, he could only infer that counsel deliberately tried to inflame the jury's passion and "somehow get [the jurors] to think that this poor nurse is the one [who is] going to bear the brunt of the jury's verdict." Konewko noted that this was a close, hard-fought case and that "every little increment is that much more important."

¶ 76 The trial court denied the posttrial motion. It stated that both sides presented excellent cases. The court determined that, while the evidence was close, it supported the verdict: "[I acknowledge that there may have been some] disconnect between Nurse Shriver and Nurse Begler in terms of the phrase standby assist versus minimal assist. However, there was ample testimony from Nurse Begler herself[,] setting aside the experts ***." The court also acknowledged that

Begler's testimony contained inconsistencies but that, in the light most favorable to the defense, it supported the verdict.

¶ 77    Despite the closeness of the evidence, the court did not believe that the complained-of comments in Advocate's closing argument were so prejudicial as to result in the return of an improper verdict. The court quoted *Rush*, 255 Ill. App. 3d at 362: "To warrant reversal, the improper comment must contain language so specific that it is reasonably understood to refer to the financial status *of one of the parties* and results in prejudice to the complaining party." (Emphasis added.) It then explained:

> "The burden here is on the movant *** to establish that these comments were so prejudicial [as to warrant a new trial].

> * * *

> *In this case it is clear, and I think no one disagrees, that Nurse Begler was not a party and that under the case law does make a difference.*

> Secondly, the objections were sustained and the jury was instructed to disregard the [comments].

> Finally, and somewhat importantly, the special interrogatory was answered in the negative when asked whether or not [Advocate's agents] were negligent, and the jury said no. So it would appear from that, at least, although the jury questioned—I had forgotten about that—the jury question[ ] does at least indicate that they had some discussion about money.

> * * *

I think *** [Advocate's attorney] would probably agree that that was a line he should not have crossed and he knows that; however, I do not believe that rises to the level of reversible error." (Emphasis added.)

The court concluded: "It was an excellent trial on both sides. And the jury had its say and that's where we are in the case." This appeal followed.

¶ 78                                    II. ANALYSIS

¶ 79     On appeal, Konewko primarily argues that he is entitled to a new trial due to Advocate's improper closing argument. He also argues that he is entitled to a JNOV or a new trial, based on the manifest weight of the evidence. We agree with only Konewko's primary argument. Nevertheless, at the end of our analysis, we will briefly address Konewko's request for a JNOV, because, if that argument *were* successful, Konewko would be entitled to the greater relief of a judgment in his favor and there would be no need to remand for a new trial. We will not address Konewko's alternative basis for seeking a new trial, based on the evidence.

¶ 80     In considering the propriety of the closing argument, the overriding principle is that it is improper to appeal to the sympathy of the jury during closing argument, such that the jury's decision is based upon that sympathy, undermining the integrity of the verdict. See *id.* Worse still is when an improper argument not only appeals to the jury's sympathy but also injects an improper element into the case. See *id.* at 361; *Koonce*, 307 Ill. App. 3d at 461; *Torrez*, 43 Ill. App. 3d at 783. This makes it more likely that the jury's verdict was influenced by the improper comment. *Koonce*, 307 Ill. App. 3d at 461.

¶ 81     Courts have found the following comments to be improper in that they encourage the jury to depart from a position of neutrality and reason, appeal to the jury's sympathy, and/or inject improper elements into the case. An attorney may not ask a jury to put itself in the position of a

plaintiff or a defendant. *Id.* at 457. It is improper to refer to a party's financial position. *Rush*, 255 Ill. App. 3d at 362. The concern is that the jury will favor the party least able to bear the loss. *Id.* It is also error to direct a jury's attention to the effect of an adverse verdict upon a defendant's professional reputation (*Torrez*, 43 Ill. App. 3d at 783) or to suggest that a defendant will be personally responsible for the satisfaction of a money judgment (*Koonce*, 307 Ill. App. 3d at 456). The latter two comments have been found not only to elicit the jury's sympathy, but to inject improper elements into the case—a defendant's reputation and ability to pay the judgment. *Rush*, 255 Ill. App. 3d at 362.

¶ 82    Also, so long as the attorney's meaning was clearly conveyed to the jury, it does not matter that he or she was cut off and unable to complete the comment. *Torrez*, 43 Ill. App. 3d at 783. Additionally, a comment can be improper even if it is untrue. See *Lenz v. Julian*, 276 Ill. App. 3d 66, 74-75 (1995) (implying that the defendant would be personally responsible for a money judgment against him, even though, unbeknownst to the jury, the State had agreed to indemnify him). In fact, a comment can be all the more egregious when false, because it has no purpose *but* to elicit the sympathy of the jury. See *id.*

¶ 83    Not every improper comment requires a reversal. Isolated comments that are incidental to a proper purpose typically do not warrant reversal. *Mondelli v. Checker Taxi Co.*, 197 Ill. App. 3d 258, 275 (1990). Also, generally, a court can cure an improper comment by sustaining the objection and instructing the jury to disregard the comment. *Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967, ¶ 62. However, sustaining the objection might be insufficient to cure the prejudice in certain instances, such as when the comment was repeated or made in violation of prior court orders, including orders on motions *in limine*. *Pleasance v. City of Chicago*, 396 Ill. App. 3d 821, 828-29 (2009); *Lenz*, 276 Ill. App. 3d at 74-75.

¶ 84    Reversal is warranted where undue emphasis was placed on the comment, such that the jury's verdict was affected by it (*Rush*, 255 Ill. App. 3d at 362) or where the verdict resulted from the passion or prejudice of the jury rather than from an objective consideration of the evidence (see *Torrez*, 43 Ill. App. 3d at 784). Additionally, when the evidence is close, such that a jury might reasonably return a verdict for either party, the attorney's improper comments might warrant a reversal. *Lee v. Calfa*, 174 Ill. App. 3d 101, 111-13 (1988); see also *Koonce*, 307 Ill. App. 3d at 461 (the evidence did not overwhelmingly favor one party); *Torrez*, 43 Ill. App. 3d at 783-84 (the evidence was close).

¶ 85    The trial court is in the better position to determine the prejudicial effect of an improper comment, and its decision as to whether the improper comment warrants a new trial will not be reversed absent an abuse of discretion. *Torrez*, 43 Ill. App. 3d at 783. However, the trial court is allowed greater latitude in granting a motion for a new trial than in denying one. *Id.* at 782. Also, the trial court will be found to have abused its discretion where it misapplies the law. See, *e.g.*, *Carlson v. Jerousek*, 2016 IL App (2d) 151248, ¶ 69.

¶ 86    We find three cases most helpful in illustrating these points: *Rush* and *Torrez*, cited by Konewko, and *Kass v. Resurrection Medical Center*, 316 Ill. App. 3d 1108 (2000), cited by Advocate.[2] In *Rush*, the defendants improperly argued that " 'Dr. Hamdy [(one of the defendants)]

---

[2] At oral argument, Advocate urged this court to rely on *Pleasance*, 396 Ill. App. 3d 821, and *Koonce*, 307 Ill. App. 3d 449, in which the comments warranting reversal were, in Advocate's view, more egregious than those in the instant case. *Pleasance* and *Koonce* are not medical malpractice cases.

   After oral argument, Konewko moved to cite additional authority, *Walton v. City of*

has his professional reputation on the line here. If he has seemed uptight or excited at times, please consider that he has a lot at stake here,' " and Dr. Hamdy is not " 'here to be hit with a money verdict.' " *Rush*, 255 Ill. App. 3d at 358, 360. Both comments were objected to; the first objection was overruled, and the second objection was sustained. *Id.* at 358. The appellate court determined that, together, these comments were prejudicial enough to warrant a new trial. *Id.* at 362. The reference to Dr. Hamdy's professional reputation injected an improper element into the case and was made in violation of a motion *in limine* order. *Id.* at 359. The reference to Dr. Hamdy's financial condition, *i.e.*, that he would be " 'hit with a money verdict,' " also injected an improper element into the case and was made in violation of a motion *in limine* order. *Id.* at 360-62. The court rejected without discussion the defendants' claim that any error was cured when the court sustained the objection to the second comment. *Id.* It accepted the plaintiffs' argument that the nature of the comments (and the violations of the motions *in limine* orders) required more than a sustained objection to cure the error and resolve the prejudice. *Id.*

———————————————

*Manchester*, 666 A.2d 978 (N.H. 1995). Advocate objected, arguing that *Walton* is distinguishable. We took the motion with the case and we herein grant the motion. We may look to *Walton* for persuasive value only. *Walton* bears some similarity to the instant case, in that the improper comments concerned the party's agent. Like in our case, defense counsel painted its agent, a volunteer coach, as a sympathetic figure and implied that the coach was the " 'true defendant' " in the case who would bear responsibility or, at least, suffer negative consequences from an adverse verdict. *Id.* at 981. Unlike in our case, however, the trial court in *Walton* overruled the plaintiff's objections to the line of commentary. While we have considered *Walton*, it is not necessary to our opinion and does not influence our analysis.

¶ 87    Next, in *Torrez*, the defendant improperly argued, " 'I am concerned though, and I am seriously concerned, because this man's right to practice medicine by reason of this lawsuit—.' " *Torrez*, 43 Ill. App. 3d at 782. The plaintiff objected, stopping the defendant from finishing his comment. The court sustained the objection, stating: " 'It is not an item of dispute here, [counsel].' " *Id.* No other improper comments were made. The jury returned a verdict for the defendant. The trial court granted the plaintiff's motion for a new trial, noting the improper closing argument and the closeness of the evidence.

¶ 88    The appellate court affirmed. *Id.* at 784. As an issue of first impression for the 1976 court, it determined that it is improper to direct the jury's attention to the effect of an adverse verdict upon a defendant's professional reputation and ability to practice. *Id.* at 783. It was of no import that the defendant was not able to finish his comment, because "what he was trying to say was clearly conveyed to the jury." *Id.* Also, the court was not swayed by the fact that the plaintiff's objection was promptly sustained, because an improper element, nevertheless, had been injected into the case. *Id.* It concluded that the trial court did not abuse its discretion where, although the evidence supported the verdict, the evidence was close and the verdict could have resulted from passion or prejudice. *Id.* at 783-84.

¶ 89    Finally, in *Kass*, the mother of a child born with cerebral palsy sued the hospital and two doctors. In context, the plaintiff began her closing argument by noting that this was the child's only day in court. Later, she accused the defendants of " 'creat[ing] evidence to cheat a crippled child of what she's due.' " *Kass*, 316 Ill. App. 3d at 1110. The three defendants then presented separate closing arguments. At the end of the final argument, one of the defendants, Dr. Zaburda, made a single improper comment: " '[The plaintiff] said that [the child] only has one day in court, but I must tell you Dr. Zaburda only has one day in court, too, and that's today. The decision that

you make will affect her professionally and personally.' " *Id.* at 1110-11. The plaintiff objected, and the trial court sustained the objection and struck the comment. The jury returned a verdict for the defendants. The trial court later granted the plaintiff's motion for a new trial, on the sole basis that Dr. Zaburda made one improper comment during closing argument. The appellate court reversed, reasoning:

> "[I]t was a brief remark, coming at the end of defense counsel's argument. *** The jury had heard 9 days of trial testimony from 16 witnesses, 11 of them medical experts, including the two defendant doctors. While there was enough evidence to find in favor of the plaintiff, the defendants mounted a strong defense.
>
> We find it difficult to see how defense counsel's offending remark could have been enough to tip the scales. After all, the jury found in favor of the hospital and both doctors. The remark referred only to Dr. Zaburda, against whom the evidence was far from persuasive." *Id*. at 1114.

The *Kass* court acknowledged *Torrez* but, without much discussion, declined to follow it. Both *Kass* and *Torrez* contained a single improper comment concerning a defendant's reputation, for which an objection was sustained. We infer that the *Kass* court recognized that, in *Torrez*, the evidence was close but that, in the case before it, the evidence against the defendant was "far from persuasive." *Id.*

¶ 90     Turning to the instant case, Advocate made *many* improper comments in the context of a closely balanced case. In reviewing these comments, we set aside for the moment that Advocate made the comments in reference to its agent, rather than itself. Advocate began by informing the jury that Begler's professional reputation was at stake: "Lisa Begler's reputation as a nurse[,] the dedication that she does in and out, going back decades ***. *** We take it seriously. [Begler]

- 31 -

takes it seriously. \*\*\* *That's why we're here.*" (Emphasis added.) This reputation comment is as overt as the improper reputation comments in *Rush*, *Torrez*, and *Kass*. With the phrase, "That's why we're here," Advocate wrongly informed the jury that the case was just as much about Begler's reputation as it was about Konewko proving the elements of his negligence claim. Advocate injected an improper element into the case by inviting the jury to consider whether Begler, a sympathetic witness and a dedicated nurse, deserved a mark against her reputation. Although Konewko did not object to this opening comment, he later pointed out that it colored the comments that were to follow and showed a persistent scheme to play upon the jury's sympathy and inject improper elements into the case. Also, it does not matter that Advocate did not use the words "at stake," because the point that Begler's reputation was "at stake" was clearly conveyed to the jury. See *Torrez*, 43 Ill. App. 3d at 783.

¶ 91 Advocate's second remark, "And the first thing that popped into my head was how many shifts, how many years, a nurse and a physical therapist in their life would have to work to earn $800,000," is improper for three reasons: (1) it suggests that Begler would be personally responsible for a money judgment, (2) it refers to Begler's financial position, and (3) it asserts facts not in evidence, *i.e.*, that Begler, who did not testify to her salary or her net worth, was a person of modest means. See, *e.g.*, *Pleasance*, 396 Ill. App. 3d at 828 (counsel may not argue facts not in evidence). The first two bases—the suggestion of personal responsibility and the reference to financial position—extend beyond an appeal for sympathy and inject improper elements into the case. See *Rush*, 255 Ill. App. 3d at 361; *Torrez*, 43 Ill. App. 3d at 783.

¶ 92 The third remark—asking the jury to put itself in Begler's position—is a classic appeal for sympathy, and courts have expressly prohibited the phrase. *Koonce*, 307 Ill. App. 3d at 457. Also, the court barred its use in a motion *in limine* order. Again, it does not matter that the phrase was

not completed, because its meaning was clearly conveyed to the jury. *Torrez*, 43 Ill. App. 3d at 783.

¶ 93    The fourth remark, that Konewko "mocked" Begler, was, arguably, an appeal to the jury's sympathy. Immediately after the sustained objection to that remark, Advocate launched into a reiteration of its second, most egregious remark: "And then asking with all the expert witnesses that have made all this money in this case, then asking to award a sum of money that would take years for nurses and physical therapists—." The trial court was struck by the brazen nature of the comment, as captured in its admonition, "That's sustained and stricken from the record. *Please, Mr. Johnson.*" (Emphasis added.) With this comment, Advocate again implied that Begler would be responsible for a money judgment and, this time, referenced not only Begler's financial position, but also Konewko's. By stating that Konewko, and his attorney, had the resources to hire expert witnesses "that have made all this money in this case," it not only portrayed Begler as being of modest means but also portrayed Konewko as having vast means and able to bear a loss. This comment was also in violation of the court's motion *in limine* order.

¶ 94    Moreover, these comments were made following an otherwise well-fought case, where the evidence was closely balanced such that the jury could have reasonably returned a verdict for either side. For example, in support of Advocate, Shriver testified that Begler met the standard of care. Begler testified that, per her practice, she would have taken Konewko's vital signs. She remembered that he was alert, oriented, and able to follow commands. She performed a strength assessment, which Konewko passed. Although Konewko reported feeling dizzy at 8:10 p.m., he was not dizzy at 9 p.m., when he asked to use the commode. Begler helped Konewko turn and sit in the bed. She helped him stand by putting his arm over her shoulder, even though he demonstrated during the strength test that he could stand on his own. Begler used a walker to help

Konewko reach the commode, and she demonstrated her use of the walker for the jury. It is not clear whether Konewko was able to use the walker for support while he turned. Begler thought she had a hand on Konewko as he turned. She described his descent onto the commode in less dramatic fashion than Konewko. To her recollection, Konewko was halfway down before he descended into a hard sit. Although he cried out in pain, he did not report a "significant number" on the pain scale. Begler did not believe that two persons and a gait belt were necessary to move Konewko. Shriver supported Begler's view that a patient's assessment can change from shift to shift. Indeed, it had been 12 hours since Vancura had evaluated Konewko as needing two nurses and a gait belt. Konewko was more than 48 hours out of surgery, and, the jury could have reasonably inferred that, at some point between the surgery and the anticipated discharge home 72 to 96 hours after surgery, Konewko would no longer need two nurses and a gait belt to ambulate. As to causation, Dr. Deutsch testified that the nerve damage occurred during the first surgery or due to infection. His view was supported by the fact that Konewko experienced increased leg weakness prior to the commode incident. Konewko also showed symptoms of infection—severe headaches and fluid leakage. The inference is that, if the increased leg weakness occurred and persisted following the first surgery, then, ultimately, the second surgery might have been necessary independent of the commode incident.

¶ 95    According to Konewko, however, Begler did not use a safety device, such as a gait belt or a walker. She did not use a second nurse, as Konewko had needed earlier in the day. In fact, earlier in the day, two nurses were insufficient to help Konewko ambulate safely. His knee buckled, and they returned him to bed. Additionally, Konewko's knee buckled during physical therapy and Sales ordered him a knee brace. Begler did not investigate the knee-brace order, and Konewko would later testify that his knee buckled during the commode incident. It took Konewko three attempts

to stand in front of Begler during the get-up-and-go test. Despite this history, and perhaps without due consideration of this history, Begler expected Konewko to turn, largely on his own, and sit onto a commode that was of regular height, not friendly to those with disabilities, and with no railings. Konewko disagreed that Begler kept her hand on him. He disagreed that she instructed him in any way other than telling him to sit. Konewko described his descent as a fall. As he turned, he lost all control. He flailed and tried to keep his balance, but he went "straight down" and hit the seat. He hit the seat at a 45-degree angle. He screamed and was in "substantial" pain. Levin, Konewko's standard-of-care expert, testified that Begler violated the standard of care. As to causation, Dr. Mataragas testified that his "working diagnosis" heading into the revision surgery was that the commode incident caused a screw to move and damage the nerve. While the revision surgery did not necessarily support that view, it remains that the revision surgery followed shortly after the commode incident. Dr. Mataragas is the person who decided to do the second surgery, so it is difficult to argue with his statement that the commode incident was a factor *for him* in deciding to perform the surgery.

¶ 96    It is also worth noting that the only two occurrence witnesses, Konewko and Begler, each gave flawed testimony. Konewko had numerous memory gaps. Begler did not contemporaneously document the use of a walker, even though she claimed that Konewko immediately told her he would sue over the incident. Also, just two years after the incident, in her 2012 deposition, she described helping Konewko reach the commode, but she did not mention the walker. Then, in 2017, just prior to trial and seven years after the incident, she clarified that she *did* use a walker. The evidence was close, with favorable facts, as well as omissions and inconsistencies, on each side. This primed the jury to be influenced by appeals to its sympathy.

¶ 97    In comparing the comments in this case to those in *Rush*, *Torrez*, and *Kass*, as well as the context in which they were made, we determine that a reversal is warranted. Advocate made four to five improper comments, as compared to two comments in *Rush*, one comment in *Torrez*, and one comment in *Kass*. The repeated nature of the comments shows an intent to appeal to the sympathy of the jury. Also, like in *Rush*, the comments violated the trial court's motion *in limine* orders, here, to refrain from mentioning *any* evidence that relates to the financial status of the parties or asking the jury to put itself in the position of a party. Like in *Rush* and *Torrez*, the fact that the court sustained the objection to one or more of the comments does not preclude reversal, where the comments appealed not only to the sympathy of the jury but also injected improper elements into the case. While the court here did sustain and *strike* the offending comments, the better practice, particularly in the face of repeated improper comments, would have been to expressly instruct the jury to *disregard* the comments. Most importantly, like in *Torrez* and unlike in *Kass*, the evidence in the instant case was close, such that a jury might reasonably have returned a verdict for either party. Indeed, the appeals to sympathy on behalf of Begler appear to have influenced the jury's deliberation, because the jury asked if it could answer the special interrogatory in the negative and find that *Advocate's agents* had not acted negligently, yet still require *Advocate* to pay Konewko's medical expenses.

¶ 98    Granted, the trial court might have accepted Advocate's explanation that it did not intend to ask the jury to put itself in Begler's position and was, instead, trying to make a standard-of-care argument. It also might have accepted that, as in *Kass*, Advocate's comments were made, in part, for restorative purposes in response to Konewko's own questionable comments. Although Advocate did not object, Konewko opened by asking the jury to have "empathy" for his situation, a request akin to asking the jury to put itself in his position. Also, Konewko disrespected Begler

when he questioned whether she really had used a walker: "Careful and meticulous, question mark. Doubt it, exclamation point." Additionally, the record shows that Konewko questioned Begler in an aggressive manner, as the court admonished Konewko for his argumentative tone and, shortly thereafter, *sua sponte* instructed Konewko to step back from the witness. However, even if the court were to have forgiven two of Advocate's comments as restorative, with Advocate's request to the jury to put itself in Begler's position canceling out Konewko's appeal for empathy, and with Advocate's "mocking" comment canceling out Konewko's disrespectful "doubt it" comment, we are still left with the comments concerning professional reputation, financial status, and bearing responsibility for a money judgment. In total, for the reasons discussed, these comments are at least as problematic as those in *Rush* and *Torrez*.

¶ 99    Advocate does not strenuously dispute that, if these comments had been made in reference to Advocate itself, rather than its agent, reversal would be warranted. Rather, in attempting to distinguish each of Konewko's cited cases, Advocate repeatedly notes that the comments at issue in those cases pertained to *a party*. The trial court subscribed to Advocate's position.

¶ 100    However, we think it matters not whether the comments refer to a party or the party's agent, but whether the comments prejudice the jury in favor of or against a party. To hold otherwise would be to allow an attorney to make any number of improper, inflammatory remarks, perhaps in contravention of motion *in limine* orders, or at least the underlying purpose of those orders, and be excused merely because the comments pertained to a party's agent and not the party itself. This position would lead to gamesmanship, allowing an attorney to subvert the purpose of a motion *in limine* order, and opportunism, as a party's agent might be more relatable, more human, and therefore more sympathetic than the party itself. In support of our view, we examine the basis for the trial court's incorrect position here that party status was dispositive, and we discuss two cases,

*Mondelli*, 197 Ill. App. 3d 258, and, anecdotally, *Lee*, 174 Ill. App. 3d 101, in which party status did not matter to the prejudicial nature of the challenged comments.

¶ 101    In determining that party status was dispositive, the trial court relied on the following quote: "To warrant reversal, the improper comment must contain language so specific that it is reasonably understood to refer to the financial status of one of the parties and results in prejudice to the complaining party." See *Rush*, 255 Ill. App. 3d at 362. The court placed an emphasis on the phrase, "one of the parties," when, in context, it should have been more concerned with whether the "language [of the complained-of comment was] so specific that it is reasonably understood to refer to [one's] *financial status*." (Emphasis added.) For example, the *Rush* court decided that the phrase " 'hit with a money verdict' " was specific enough to have misled the jury into believing that the defendant would bear the burden of a money judgment. *Id.* It distinguished itself from a case where the language, "[t]hat complaint is served on [the defendant], he comes to court, he hires an attorney, he defends the case," was *not* specific enough to be reasonably understood as referring to the subject's financial condition. (Internal quotation marks omitted.) *Id.* at 361. Thus, the question was whether the comment misled the jury to believe that an individual or entity would be harmed by a money judgment against it, thereby injecting an improper element into the case. *Id.* We believe that it is possible to make this insinuation about a party's agent as well as the party itself. That the insinuation is false does not make it less prejudicial. See, *e.g.*, *Lenz*, 276 Ill. App. 3d at 74-75. Rather, the implication that a nonparty will be harmed by an adverse judgment can be considered more egregious, because the implication has no purpose but to inflame the passions of the jury.

¶ 102    In *Mondelli*, party status did not matter to the prejudicial nature of the challenged comments. In *Mondelli*, the plaintiffs were struck by the defendant cab driver. The plaintiffs'

counsel asked one of the plaintiffs whether she had seen " 'any other doctors' " for her resulting injuries. *Mondelli*, 197 Ill. App. 3d at 274. The plaintiff answered that she had seen " 'Dr. Milgram.' " When asked who Dr. Milgram was, the plaintiff answered, " 'I was sent there *by the cab company insurance* over there for him to examine me.' " (Emphasis added.) The court acknowledged that injecting the subject of insurance into a case is generally improper, but it determined that the plaintiff's comments did not constitute reversible error. *Id.* at 274-75. It explained that the reference to insurance was isolated, inadvertent, and nonresponsive to a legitimate line of questioning. *Id.* at 275. There was no indication that the plaintiffs' counsel intended to elicit such a response to improperly influence the jury. *Id.* There was no indication that the plaintiff herself made the comment with the intent of improperly influencing the jury. *Id.* Moreover, there was no prejudice, particularly where the defendants' witness issued similar commentary concerning the review of insurance claims. *Id.* at 276. The court rejected the defendants' argument that only comments made by nonparties could be excused as nonprejudicial. *Id.* at 275. Rather, the court countered, "[t]he only issue to be resolved is whether [the offending] comment was elicited by *** counsel with an intent or design to influence or prejudice the jury." *Id.* Whether the comment was made by a nonparty or a party was of no import. See *id.*

¶ 103 *Mondelli* is not perfectly analogous to the instant case. *Mondelli* involved witness testimony, rather than closing argument. Also, the question in *Mondelli* was whether the challenged comment need be *stated* by a party, not whether the challenged comment need *refer* to a party. Nevertheless, the most salient point in *Mondelli* is analogous to the instant case. That is, the court should consider whether the attorney—by his or her question or, in our case, his comment—improperly influenced the jury. *Id.*

¶ 104   Finally, *Lee* also shows that a comment referring to a nonparty can improperly influence the jury. In *Lee*, defense counsel disparaged the integrity of the plaintiff's expert, stating that the expert "sold" his testimony and implying that the plaintiff and the expert conspired to give false testimony. *Lee*, 174 Ill. App. 3d at 112. The trial court denied the plaintiff's motion for a new trial. However, the appellate court determined that those remarks, in combination with remarks against the plaintiff himself and other errors, warranted reversal. *Id.* In *Lee*, that the plaintiff's expert was not a party was a nonissue. *Lee* demonstrates that it is possible to sway a jury for or against a party by making improper comments about nonparties, be they agents or experts.

¶ 105   We acknowledge that, generally, the decision to deny a motion for a new trial based on improper comments in closing argument is a matter of discretion for the trial court. Here, however, the trial court failed to exercise the full range of its discretion when it incorrectly found that the improper comments could not warrant reversal because they pertained to a nonparty. Further, to whatever extent the court believed that the jury fully understood that Begler was not a party to the case and that the jury had not been confused by Advocate's comments, that belief is belied by the jury's question during deliberation. When the jury asked if it could find Advocate's agents (*i.e.*, Begler) not negligent, but still order Advocate to pay Konewko, it showed that it was concerned about Begler's reputation and wanted to ensure that she would not be a responsible party in the lawsuit. Moreover, answering the special interrogatory in a manner so as to relieve Begler from "blame" directed the outcome of the lawsuit. We are not persuaded by Advocate's point raised at oral argument that several of the improper comments did not refer to Begler by name, but referred only to nurses in general. There was only one nurse in the room with Konewko at the time of the commode incident. Begler was the face of Advocate for the purposes of this case. Again, by pointing to Begler, Advocate accessed a figure that was more human, more relatable, and more

sympathetic than it could ever portray itself, a business entity, as being. Likewise, we are not persuaded by Advocate's point that the problematic comments were not unduly prejudicial when made in the context of a 45-minute closing argument following a nine-day trial. Advocate chose to risk the legitimacy of an otherwise well-run trial by repeating improper comments even after the court had sustained objections to the same. Advocate did so at its own peril.

¶ 106   In sum, the trial court erred in determining that the comments at issue could not constitute reversible error, because they referred to Advocate's agent, rather than Advocate itself. As such, we determine that the trial court abused its discretion. We reverse and remand for a new trial.

¶ 107   As a final matter, we briefly address Konewko's argument that the trial court erred in denying his motion for a JNOV, because, if this argument *were* successful, Konewko would be entitled to the greater relief of a judgment in his favor and there would be no need to  remand for a new trial. A court may grant a JNOV only when " 'all of the evidence, when viewed most favorably to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). A JNOV may not be granted merely because a verdict is against the manifest weight of the evidence. *Id.* Rather, a more conclusive evidentiary standard is necessary before a verdict is directed or a judgment is entered than is necessary to justify a new trial. *Id.* at 453-54.

¶ 108   Konewko's request for a JNOV hinges on the terminology employed by the standard-of-care experts and by Begler. He notes that Advocate's own standard-of-care expert, Shriver, testified that a "minimal assist" was required and that a "standby assist" would have fallen beneath the standard of care. Begler testified that she provided a "minimal assist," yet the actions she described constituted a "standby assist." Again, a "minimal assist" means that a nurse has a hand

on the patient and is ready to give the patient up to a 25% assist. A "standby assist" means that a nurse remains in close proximity to a patient in anticipation of the patient's needs.

¶ 109   We agree that, although Begler testified that she provided a "minimal assist," the actions that she described taking, arguably, did not meet that definition. Begler testified that she "might" have had a hand on Konewko as he attempted to sit. While a guiding hand is more than "close proximity," it does not provide up to a 25% assist. Still, this court was not privy to Begler's walker demonstration before the jury, so we cannot be sure of the total support given. Konewko's terminology argument, while compelling, is just one way of looking at the evidence, and we cannot find that it alone warrants a JNOV.

¶ 110   Konewko's JNOV argument is also problematic because Konewko addresses only the standard of care, not causation. It appears, therefore, that Konewko seeks a judgment as to the standard of care only and a new trial on the issue of causation. Seeking judgment on the standard of care only, without addressing causation, was acceptable at the directed-verdict stage, when the jury still would have had an opportunity to consider the element of causation in the first instance. See *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 52 (2000). Now, this approach is flawed, because, by failing to even discuss the element of causation, Konewko cannot persuade us that he is entitled to a new trial on that issue, nor does he cite any authority in support of that partial relief. Whether he might have been able to do so persuasively is not for us to consider. In any case, we have already granted a new trial based on the improper closing argument, and we will not further address Konewko's alternative bases for seeking a new trial.

¶ 111                                    III. CONCLUSION

¶ 112   For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 113   Reversed and remanded.

**No. 2-19-0684**

| | |
|---|---|
| **Cite as:** | *Konewko v. Advocate Health & Hospitals Corp.*, 2020 IL App (2d) 190684 |
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 15-L-692; the Hon. David E. Schwartz, Judge, presiding. |
| **Attorneys for Appellant:** | Robert G. Black, of Law Offices of Robert G. Black, P.C., of Naperville, and Michael Cetina, of Walsh, Knippen & Cetina, Chtrd., of Wheaton, for appellant. |
| **Attorneys for Appellee:** | Matthew L. Johnson, David M. Macksey, and Caroline K. Vickrey, of Johnson & Bell, Ltd., of Chicago, for appellee. |